MARY Z. SMITH et al., Appellees, v. MIDDLE STATES UTILITIES COMPANY OF DELAWARE, Appellant.

No. 44803.

JUNE 18, 1940.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellees.

C. E. Richmann and Hughes, O'Brien & Hughes, for appellant.

BLISS, J.—This is the second appearance of this case in this court. The former case is reported in 224 Iowa 151, 275 N. W. 158. In the former trial below, the petition alleged and the court submitted both the issue of fraud in the sale, and the agreement to repurchase. On that appeal the court held that any fraud in the sale was barred by the statute of limitations, and the judgment was reversed because this issue was submitted, but the court found no error in submitting the issue as to the repurchase contract.

Plaintiffs are an elderly married couple who retired from farming to a modest home in Osceola. Their entire property consisted of the home and about $4,100 in government bonds and bank deposits. In the early part of 1928 the plaintiffs were solicited to buy stock in the defendant company by W. J. Brownell, a stock salesman of the defendant, and W. E. Hahn, the manager of the telephone exchange at Osceola, under the control of defendant, or of one of its affiliated companies. Hahn was an old acquaintance of 20 years, and had been a neighbor of plaintiffs. They told the solicitors they had $4,100 they would like to invest so they would have it when they got old. This stock was represented to the plaintiffs as: perfectly safe in every way; as safe as government bonds; it paid good interest; that the company would pay them money back at any time they wanted it; no mortgage on the property; a safe sound investment. On April 27, 1928, these agents and representatives of the defendant sold eight shares of preferred and one share of the common stock of the defendant. At other times, up to and including the 20th day of January, 1929, when the last sale was made, these agents made stock sales to the plaintiffs, until the total amount was 41 shares of preferred, and eight shares of the common stock. The preferred stock had a par value of $100 a share, and was divided into class ''A'' and class ''B'', the only difference in the classes being that the former paid 7 percent annual dividends, and the latter, 6 percent. The common or voting stock had no par value, but every purchaser of five shares of preferred stock received one share of common stock, upon paying $1.00 a share for the latter. Plaintiffs were allowed a small discount so that their total purchases cost them $3,970. They established the purchases and payment beyond controversy. Their preferred stock was of class ''B''. Plaintiffs claim, and they alleged in their petition and amended petition, that it was a part of the stock purchase agreement that the defendant would repurchase the stock at any time the plaintiffs requested it, and would pay plaintiffs therefor par value of the stock, plus earned interest to the date of purchase. While the defendant, in its pleadings,

denied making any such agreement, it offered no evidence of any kind to the contrary, and the fact that the two salesmen mentioned sold between $50,000 and $60,000 of this stock in Clarke county and vicinity, and for some time did buy back the stock from purchasers, gives support to the plaintiffs' contention. Quarterly dividends were paid to plaintiffs on their preferred stock up to and including April 1, 1932. There is testimony that plaintiffs requested compliance with the repurchase. agreement sometime in 1931, prior to the cessation of dividend payments. Immediately after payment of dividends was stopped, repeated demands to repurchase were made, together with tenders of the stock to the defendant. All such requests were refused. Petitions were filed in the three actions on January 22, 1935, and recovery was asked because of fraud on the part of defendant in procuring the stock purchases, and also on the repurchasing agreements. The defendant at that time answered, setting up the Delaware statutes, under which it was incorporated, its certificate of incorporation, and the decisions of the highest court of Delaware, all to the effect that it was forbidden to ''use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of its capital.''

On the former appeal the ruling of the trial court sustaining the plaintiffs' demurrer to that part of the answer alleging that under its certificate of incorporation, and under the statutes of Delaware, and the decisions of its court, an agreement to use its funds to purchase its own stock was unenforceable if such use would impair its capital, was held to be error.

The present actions are based solely upon defendant's breach of the repurchase agreement, and one of the fact issues is whether such use of its funds would have impaired its capital. The defendant herein, by amended and substituted answer, filed October 4, 1938, re-alleged the illegality of the alleged repurchase agreement, and averred that at the respective times of the alleged making of the repurchase agreements ''the Corporation

had no surplus", and that "the stock upon which recovery is sought, at the time of the alleged tender to defendant, had a market value of between $8.00 and $10.00 per share." There is no proof of the last statement.

On October 6, 1938, the 3d day of the trial, the defendant amended its substituted answer by alleging that the plaintiffs had never tendered the original stock which they had purchased, but they had assigned and surrendered for cancellation said original stock, and the stock in their possession when the suits were begun were certificates issued as of September 21, 1931, and no agreement for their repurchase was alleged to have been made, and that therefore plaintiffs had no cause of action. Defendant also alleged in this amendment that if any contract of repurchase was made "it was such a contract as required the demand for repurchase within a reasonable time and prior to the expiration of the Statute of Limitations relating to the enforcement of verbal or unwritten contracts, and that more than five years have elapsed between the making of said alleged contract and the demand for said repurchase, and more than five years have also elapsed since the making of said contract of repurchase and the bringing of this suit, and said cause of action is fully barred by the Statute of Limitations in such case made and provided." All of these allegations were denied in plaintiffs' reply.

The plaintiffs, and W. E. Hahn, one of defendant's representatives who sold the stock, all as witnesses for plaintiffs, testified to the purchase of and the payment for the stock, the agreements to repurchase the stock, the repeated requests for its repurchase, the tender of the stock to defendant, and the defendant's refusal to repurchase, all as alleged in the plaintiffs' pleadings. Hahn testified that John A. Reed was the president of the defendant during all of this time; that Reed gave him a course in stock salesmanship, "what to say and what to do", and told him to sell all the stock he could, and to promise the purchasers that the defendant would take up the stock any time they wanted it to. M. L. Golliday, general

manager, told him the same things, and to let the other work go when he could sell stock. He testified that the defendant did take up the stock for a time, and paid back the purchase price to John Wilson, Mrs. Johnson, Dr. Hollenbeck, John Armstrong, Fanny Sellman, and Mr. Willy, but began refusing in 1931. He said that the plaintiffs had asked him seven or eight times to send their stock in to the defendant and to get their money, and that he had talked to Brownell, and written to the company about it; that he had written to J. W. Smiley, the vice president of the company and to Reed, the president, and they told him they could not do it, "as they weren't taking up any more stock." This witness gave the names of between 20 and 25 persons, a number of them widows, to whom he and Brownell, as agents of the defendant, had sold stock, with each of whom they had made the same kind of a repurchase agreement, as is claimed by the plaintiffs. The defendant offered no testimony, and there is no evidence in the record, disputing any of the matters of fact thus far stated. The burden was upon the plaintiffs to establish the following issues of fact, towit, the purchase of the stock, the payment therefor of the amount alleged, at the times alleged, the repurchase agreement, the demand for repurchase and the tender of the stock at the times alleged, and the refusal of the defendant to comply with the demands. H. L. Davis, assistant treasurer and general auditor of defendant since February 1927, as its witness, testified that plaintiffs' money had been received by defendant and never returned. A verdict against the plaintiffs on these issues would have no support in the record.

Before discussing those affirmative defensive allegations, the burden of whose establishment was upon the defendant, it will be very helpful to outline somewhat the business of the defendant and of its various subsidiary and affiliated corporations, and their interlocking methods of operation and doing business. The number of these companies does not definitely appear, but defendant's general auditor testified that the ap-

proximate number was 15. The certificate of incorporation of the defendant recites that its name is "Middle States Utilities Company"; its principal office in Delaware is in Wilmington; the nature of its business was to do a general telegraph, telephone, electric, gas, water, heating, utilities, and all kindred businesses of various kinds, including the organization, incorporation, and operation of other companies and corporations engaged in like businesses. (Four and a half pages of the amended abstract are used in further detailing and amplifying the "business, objects or purposes to be transacted, promoted, carried out or undertaken for itself, other corporations, associations or individuals.")

This company and the 14 other companies were known as the "Reed Companies". John A. Reed was the president of these companies. The central office of all of them was in the same room or rooms in Cedar Rapids. The officials and working force of all of them at this central office were substantially the same. One of these Reed Companies was the Utilities Holding Corporation, a Delaware Corporation. Others were the Middle States Utilities Company, a Missouri corporation, the Middle States Utilities Company, an Iowa corporation, Clinton County (Missouri) Telephone Company, the Andrew County (Missouri) Telephone Company, the Iowa Utilities Company, Creston Gas & Electric Company.

The general method of operation of the various companies respecting the acquisition of properties and their transfer to subsidiary companies, the issuance of bonds by the latter and their transfer to the appellant, and the sale of its stock and the transfer of the proceeds of the sale thereof to the Utilities Holding Corporation, have been referred to in the cases of Gregg, individually, and as administrator against this appellant, Gregg v. Middle States Co., 228 Iowa 933, 293 N. W. 66, and in view of our decision herein we will not extend this opinion with further fact recitals.

I. Appellant's first and sixth assignments of error are based upon the overruling of its motion for a directed verdict on the ground that the alleged agreement to repurchase was

694

void and unenforceable because to have done so would have impaired its capital. It is our judgment that the court was right in overruling appellant's motion to direct a verdict for it for the reason that under the record the issue of whether the repurchase of the appellees' stock would impair its capital, was one of fact for the determination of the jury.

■ II. Appellant's second assignment of error is based upon the refusal of the trial court to direct a verdict for the defendant on the ground that the plaintiffs had disposed of the stock prior to the time of the suit and had no interest therein and no right to sue thereon. The trial court was right in its refusal to direct a verdict for the defendant on this ground, as the appellant failed to establish this affirmative defense as a matter of law.

■ III. Appellant's fourth and fifth assignments of error based upon the refusal of the trial court to direct a verdict in its favor on the ground of its affirmative defense that the action of the plaintiffs was barred by the statute of limitations, has already been ruled on adversely to this contention of the defendant, in the cases of Gregg against this appellant hereinabove referred to. In those cases we hold that a cause of action on the repurchase agreement did not accrue until a demand of performance was made. In that case and in this case the demand is not merely a request preliminary to a remedy or to the bringing of an action. It is a request which is necessary to create a right. In the former situation the obligation is existent from the beginning and requires but a preliminary step to start the enforcement. While in the case before us, the sale of the stock was a completed transaction, with no obligation upon or right of action against the seller until a demand to repurchase was made upon it, and the demand was refused. The action was within five years from the making of the demand to repurchase, and there was no error.

■ IV. As heretofore noted the defendant alleged that if any contract of repurchase was made ''it was such a contract as required the demand for repurchase within a reasonable time and prior to the expiration of the Statute of Limitations

relating to the enforcement of verbal or unwritten contracts'', and that plaintiffs had failed in this respect. The first transaction involving the stock sale and repurchase agreement was on April 27, 1928, and subsequent similar transactions were had up to and including January 20, 1929. The repurchase agreements were unwritten and any actions thereon would be barred after five years from their accrual. There was evidence that demands for repurchase were made in 1931 and also just after the cessation of dividend payments about April 1, 1932. Petitions in the actions were filed January 22, 1935. We .agree with appellant's statement that the demand to repurchase should be made within a reasonable time after making the agreement. The holdings of this court and of the courts generally are that where the agreement for repurchase at the demand of the purchaser does not fix the time for the demand, it must be made within a reasonable time. Moench v. Hower, 137 Iowa 621, 624, 115 N. W. 229, 230; Calvert v. Mason City Loan & Investment Company, 219 Iowa 963, 967, 259 N. W. 452, 454, and cases from many jurisdictions cited in brief in 88 A. L. R. 842, et seq. What is a reasonable time depends upon the circumstances. The rule as adopted, generally, and by this court, has been thus stated in Reizenstein v. Marquardt, 75 Iowa 294, 296, 39 N. W. 506, 507, 1 L. R. A. 318, 9 Am. St. Rep. 477:

''And, generally, where a right of action depends upon a demand, such demand must be made within the period prescribed by the statute of limitations. Ball v. Keokuk & N. W. Ry. Co., 62 Iowa, [751,] 753 [16 N. W. 592]. This is the rule as to actions arising upon contracts, express or implied. [Citing cases.] In Codman v. Rogers [10 Pick., Mass., 112] it is held that the statute will not begin to run until demand; yet, unless demand be made in a reasonable time, the plaintiff will not be entitled to relief; and a reasonable period of time is determined by the circumstances; and where no cause for delay is shown, the time is to be fixed by the statute of limitations.''

In Mickel v. Walraven, 92 Iowa 423, 429, 60 N. W. 633, 635, a suit to set aside a fraudulent conveyance, we said:

"What is this reasonable time cannot be settled by any precise rule. It must depend upon circumstances. If no cause for delay can be shown, it would seem reasonable to require the judgment to be obtained within the time limited by the statute for bringing the action. In accordance with this rule it has frequently been held that where a demand or some other act is required of plaintiff as a condition precedent to his right to sue, the demand must be made in a reasonable time, and this time, unless there be some special circumstances shown, will be fixed in analogy to the statute of limitations."

The rule as stated above has been frequently repeated by this court in other cases. See Ball v. Keokuk & N. W. Ry. Co., supra, 62 Iowa 751, 16 N. W. 592; Lovrien v. Oestrich, 214 Iowa 298, 242 N. W. 57; Bristow v. Lange, 221 Iowa 904, 915, 266 N. W. 808.

It will be noted that the statement of the rule indicates that, upon proof of facts warranting it, the reasonable time for making the demand may be extended beyond the statutory period of limitations. However such a situation does not arise here.

The defense of the statute of limitations is ordinarily an affirmative one which must be pleaded and sustained by proof in all its essentials. The burden of showing the delay to have been unreasonable was upon the defendant. We have held that the defense of laches has no place in a law action, save where there is present the elements of an estoppel or acquiescence. Doyle v. Burns, 123 Iowa 488, 509, 510, 99 N. W. 195, 203; Thomas v. Holmes, 142 Iowa 288, 120 N. W. 636; Reinertson v. Struthers, 201 Iowa 1186, 1192, 207 N. W. 247, 250; Hubinger Bros. v. C. B. & Q. R. Co., 197 Iowa 374, 379, 195 N. W. 762, 763; Wells v. Western Union Tel. Co., 144 Iowa 605, 614, 123 N. W. 371, 375, 24 L. R. A., N. S., 1045, 138 Am. St. Rep. 317; State Sav. Bk. v. Miller, 146 Iowa 83, 88, 124 N. W. 873, 874; Tucker v. Stewart, 147 Iowa 294, 301, 126 N. W. 183, 186. In this case there is no element of estoppel or acquiescence. There is an allegation in the answer of the

depreciated value of the stock, but no proof of the allegation. However, the claim of unreasonable delay, while akin to laches, cannot be classed as such a defense in this case. Here the defense alleged is not an equitable one, but it is one at law— the statute of limitations. When the statute starts to run depends upon when the demand was made, and the defendant is entitled to plead and prove that the demand was not made within a reasonable time. This holding does not change or conflict with our holdings in the cases last cited.

The fact that the demands to repurchase were all made within 5 years from the dates of purchase, and within the statutory period of limitations for actions on unwritten contracts under our decisions that such a period is a reasonable period, particularly under the facts in this case, require us, as a matter of law, to hold that the demands were made within a reasonable time. Appellant made no showing to the contrary. The record very strongly indicates that the plaintiffs desired this investment as a safe place to conserve their money, and to bring in a good income during their declining years. There is nothing to indicate that there was much likelihood of its withdrawal at an early date. We must hold, as a matter of law, that the defendant failed to sustain this defense. See also as bearing on this question Wilson v. Iowa Southern Utilities Company of Delaware, 228 Iowa 724, 293 N. W. 77.

V. Appellant's seventh assignment of error recites that "the court erred to the prejudice of the defendant in directing a verdict in favor of the plaintiffs at the close of all of the testimony upon motion of the plaintiffs." Plaintiffs' motion to direct a verdict in their favor was based upon nine grounds. This assignment because of its omnibus character does not comply with our Rule 30 and numerous decisions of the court construing the rule, and it will not be considered. Because of our ruling on this assignment we do not pass upon the motion of the appellees to strike appellant's "Amendment and Additional Argument in Chief", containing this assignment, because of its belated filing.

■ VI. Appellant's second assignment of error is based upon the ruling of the trial court sustaining plaintiffs' motion for a directed verdict "at the close of all of the evidence and in entering judgment thereon for the reason that (a) defendant had pleaded and introduced evidence in support of a defense which was good if proved, and (b) the plaintiffs could not have judgment in their favor until a jury had passed upon the evidence and the credibility of the witnesses and found for the plaintiffs."

There was no error in the court's ruling in sustaining the plaintiffs' motion to direct a verdict, with respect to the matters set out in the (b) division of this assignment of error, for the reasons already indicated in this opinion.

In the (a) division of the assignment reference is made to the affirmative defenses pleaded. One of these defenses was that the repurchase of plaintiffs' stock would have impaired its capital, and such impairment would have made the repurchase agreement void. As we have already stated herein the issue of whether the capital would have been impaired was a question for the jury, and not one for the court. The court was in error in deciding this issue adversely to the appellant, as a matter of law.

Defendant also pleaded an affirmative defense that plaintiffs had transferred the original stock purchased by them, and did not own it, but held other stock received from the appellant in exchange for it, when they brought this action. Appellant urges that the repurchase agreements, if made, were applicable to this original stock only, and not to any stock for which it might have been exchanged. We are not passing upon this law question. Whether there was an exchange of stock intentionally made by the appellees was a question of fact for the jury, and the court was in error in withdrawing this defense from the jury.

■ VII. At the close of all of the testimony, the jury was excused until 1:30 p. m., and the appellant then moved for a directed verdict. Immediately counsel for the appellees

said: "Now, the plaintiffs agree with the defendant that the matter is a question of law for the Court, and we want to make a motion for a directed verdict too." He then made his motion. Both motions were submitted without argument, and the court said it would pass upon them when court opened at 1:30. At that time the court told the jury of the making of the motions, and stated:

"It becomes my duty, under such circumstances, to take up the motions that are filed by the plaintiffs and the motion that is filed by the defendant and pass upon them and render a decision as I see it under the record."

Counsel for the appellant made no comment or request that the case be submitted to the jury in the event appellant's motion to direct was overruled. After talking at some length about the case the court concluded with the statement that it found for the plaintiffs in the amount of $5,234.38, and the foreman of the jury signed a verdict in that amount for the plaintiffs under the direction of the court. The court made entry on its calendar that the motion of defendant to direct was overruled and the motion of plaintiffs to direct was sustained. Defendant took exceptions to both rulings and to the judgment order. The appellees concede that under the holdings of this court the fact, alone, that each side moves for a directed verdict, does not, in itself, indicate a waiver of the jury, and a consent that the court may decide the case on both the law and the facts. While the courts, generally, are about evenly divided on this question, this court has quite uniformly held as above stated. See German Sav. Bk. v. Bates Improvement Co., 111 Iowa 432, 435, 82 N. W. 1005, 1007; Teeple v. Hawkeye Gold Dredging Co., 137 Iowa 206, 214, 114 N. W. 906, 910; Hamill v. Schlitz Brewing Co., 165 Iowa 266, 294, 143 N. W. 99, 110, 145 N. W. 511; Manska v. San Benito Land Co., 191 Iowa 1284, 1287, 184 N. W. 345, 347, 18 A. L. R. 1430; New England Equitable Ins. Co. v. Boldrick, 192 Iowa 763, 770, 185 N. W. 468, 471; Walker Co. v. Dubuque Fruit Co., 113 Iowa 428, 435, 85 N. W. 614, 617, 53 L. R. A. 775.

But the appellees contend that the parties, after the making of such motions, may expressly waive the jury and consent that the entire case may be decided by the court, or that a party may by his conduct, inaction, or silence, under the circumstances, impliedly indicate such waiver and consent. There are authorities to support this contention. Wells v. Western Union Tel. Co., 144 Iowa 605, 624, 123 N. W. 371, 378, 24 L. R. A., N. S., 1045, 138 Am. St. Rep. 317; Conkling v. Knights of Ladies of Security, 183 Iowa 665, 686, 166 N. W. 384, 390; Murray v. Brotherhood of American Yeomen, 180 Iowa 626, 639, 163 N. W. 421, 425; Bukowski v. Security Benefit Assn., 221 Iowa 416, 420, 265 N. W. 132, 135. See also Battis v. McCord, 70 Iowa 46, 48, 30 N. W. 11, 12, and Gray v. Central Minnesota Immigration Co., 127 Iowa 560, 562, 103 N. W. 792. Appellees especially contend that the facts herein bring this case within the facts and holding in the Murray case, supra. The appellant did not expressly consent, and it is our conclusion that under the record and under the prior holdings of the court, it cannot be said that it impliedly consented. If there were any question in our minds on this point, it would be removed by the rather extreme holding of the court in Mechanics Savings Bank v. Polk County, 195 Iowa 1142, 193 N. W. 401. For extensive briefs on the entire question see 18 A. L. R. 1433, 69 A. L. R. 633, and 108 A. L. R. 1315.

Appellees' motion to strike appellant's ''Additional and Amendment to Appellant's Original Brief and Argument,'' filed August 8, 1939, was overruled on September 19, 1939, before the submission.

The judgment is reversed and remanded for the reasons stated in division VI hereof.—Reversed and remanded.

HAMILTON, C. J., and SAGER, HALE, MILLER, OLIVER, and STIGER, JJ., concur.