EARL GREGG, Appellee, v. MIDDLE STATES UTILITIES COMPANY, Appellant.

EARL GREGG, Special Administrator, Appellee, v. MIDDLE STATES UTILITIES COMPANY, Appellant.

No. 45083.

934

June 18, 1940.

Rehearing Denied September 27, 1940.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellees.

C. E. Richmann and Hughes, O'Brien & Hughes, for appellant.

BLISS, J.—This is the second appeal of these cases to this

court. On the other appeal, reported in 225 Iowa 941, 282 N. W. 305, judgments for each plaintiff were reversed. The appeals were from the sustaining of plaintiffs' demurrer to the answers. The petition in each action was filed on November 6, 1935. After the death of Nancy Bishop, her son Earl Gregg, a man 71 years old at the time of the trial, as special administrator of her estate, was substituted as plaintiff in the action begun by her. In all of the stock transactions, involved in both actions, Earl Gregg acted for himself, and also for his mother. For his mother, Gregg made three purchases of the preferred stock of the defendant, to wit: one share for $100, on February 1, 1928; five shares of preferred, and one of class "A" common stock, on July 1, 1929, for $500; two shares of preferred, in 1929, for $200. For himself, Gregg purchased four shares of preferred and one of common stock, on February 1, 1928, for $400; one share of preferred, on April 2, 1928, for $100; ten shares of preferred and two of common, on July 1, 1929, for $1,000; and ten shares of preferred and two of common, on October 1, 1929, for $1,000. In addition to the above stated matters, the petitions alleged that in each purchase the defendant was represented by its agents and employees, W. J. Brownell and W. E. Hahn, who verbally agreed with and represented to Gregg, as a part of each transaction, and as consideration for the purchase, that the defendant would repurchase the stock and pay back the purchase price, at any time such demand was made upon the defendant. The petitions further allege the demand and tender of the stock and the refusal of the defendant to repurchase. For answer the defendant admitted that it was organized under the laws of Delaware, and that by the statutes of that state, the decisions of its courts, and the provisions of its certificate of incorporation, it was forbidden to use its funds or property for the purchase of its own stock, when such use would cause any impairment of its capital. The answer further alleged that at the times alleged in the plaintiff's petitions relative to the purported repurchasing agreements, it had no surplus and any such use of its property would have impaired its capital, and that the alleged

agreements were void, and made without authority. All other allegations of the petitions were denied. By an amendment to the answer it was alleged that the cause of action as to each purchase accrued more than five years prior to the bringing of the suits, and was barred by the statute of limitations. By reply, plaintiffs denied the affirmative defenses of the answer, realleged the repurchase agreements, and averred that defendant had received and retained the purchase price, and ratified the acts of its representatives.

At the close of all of the testimony each side moved for a directed verdict. Defendant's motion was denied, and plaintiffs' motions were sustained. Judgment for the full amount prayed for was entered for each plaintiff.

The appellant assigned three errors as grounds for reversal. The first assignment is that the court erred in refusing to sustain its motion to direct a verdict for it, on the ground that the actions were barred by the statute of limitations. (Code, 1939, section 11007.) The second assignment is that the court erred in refusing to admit in evidence, defendant's Exhibits 2 to 8, inclusive, being certain journals, ledgers, and other claimed books of original entry of the defendant, offered by it in proof of its defense that the alleged repurchase agreement was void because an impairment of its capital. The third assignment is that the court erred in sustaining plaintiffs' motions for directed verdicts.

Before discussing these assignments we will refer to some matters of fact shown by the record. Some of these matters together with additional matters are mentioned in our opinion in the case of Smith et al. against this defendant, in which the pleadings and proof are much the same as in this case. The decision therein is reported in 228 Iowa 686, 293 N. W. 59.

As noted in said opinion, the appellant, Middle States Utilities Company, and its affiliate, the Utilities Holding Corporation, were organized as Delaware corporations, about 1926. About the same time, the promoters of the two above mentioned corporations organized the Middle States Utilities Company, a

Missouri corporation, and the Middle States Utilities Company, an Iowa corporation. These last two corporations and others mentioned in the Smith case are referred to as corporations subsidiary to the appellant and its Delaware affiliate. As stated in the Smith case these corporations were all promoted, officered, managed and operated, in general, by the same men. There were about 12 or 15 of these companies. There was much shifting of assets from one to the other. While the record of the purchase and the transfer of the various telephone properties is not fully shown in the record, it appears that the Utilities Holding Corporation would acquire the various telephone properties and exchanges, and would then transfer them to either the Missouri or Iowa subsidiaries, as the geographic location of the properties might require. The Middle States Utilities Company of Iowa operated telephone properties in 21 towns at the time of the trial. The Middle States Utilities Company of Missouri operated exchanges in 14 towns. The Andrew County (Missouri) Telephone Company and the Clinton County (Missouri) Telephone Company, which were other subsidiary corporations, operated seven and six exchanges, respectively. Very few of the prices at which the Utilities Holding Corporation bought exchanges, and very few of the prices for which that corporation transferred them to the subsidiary companies are shown in the record before us. It does appear that the Utilities Holding Corporation acquired the Osceola telephone plant—building, switchboard, lines, and the Northwestern Bell Telephone local exchange—for $38,418, and a little later when it transferred this plant to the Middle States Utilities Company of Iowa, that company was charged therefor on the books of the Utilities Holding Corporation, $69,050.45. The appellant was a holding company rather than an operating company, although at times it operated one or two companies. Some evidence of the shifting of assets appears from the fact that prior to 1929 the appellant operated the Osceola telephone property, known as the Clarke County Mutual Telephone Company, and about May 1, 1929, it was transferred to the Middle States Utilities Company of Iowa, who operated it until some time prior to July 1,

1931, when it passed to the Utilities Holding Corporation, who operated it until October or November 1938 when it was turned back to the Middle States Utilities Company of Iowa, who held it at the time of the trial in 1939.

H. L. Davis, assistant treasurer and general auditor of the appellant and who had been connected with that company in various capacities since 1927, was a witness for appellant. He testified that: The appellant, the Utilities Holding Corporation, the two Middle States Utility Companies of Iowa and Missouri "were very closely related"; that he had worked for all of them, during the same periods and at different periods; John Reed was the president of all of these companies until his death in January 1933; the vice presidents, directors, and employees were pretty much the same; Golliday, who lived at Holden, Missouri, was general manager for all of the telephone operating companies; J. W. Smiley was the man in charge of the securities department; W. J. Brownell was a securities salesman in the employ of the Middle States Utilities Company of Missouri. Mr. Weekly, a witness for appellant, testified that he was the General Manager of the Middle States Utility Companies subsidiary companies, and was in charge of operating and maintaining them, and that he managed the Osceola plant since July 1, 1931, while it was operated by both the Utilities Holding Corporation and the Middle States Utilities Company of Iowa.

The plaintiff introduced in evidence Exhibits T, U, V, W and X. Davis testified that all of them were prepared and sent out of the general offices of the appellant and its associated companies. These were sent to Earl Gregg, as one of the stockholders of the appellant. Exhibit T, contained these statements:

"$100,000.00

"Middle States Utilities Company
6% Cumulative Preferred Stock
Par value—$100.00 per Share
Dividends payable quarterly."

"We are now offering an issue of $100,000.00 of our Cumu-

lative Preferred Stock. Dividends paid quarterly on the first day of January, April, July and October. The proceeds of this issue will be used to partially reimburse the Company for expenditures made for major improvements and additions on the property of two smaller companies in which this Company has large interests and which are operated as a part of its interconnected system. * * * This Company was organized in 1926, since which time it has expended over $900,000.00 in interconnecting and improving the properties. The total assets of the Company as shown by the books of the Company, on June 30, 1931, aggregated $2,215,243.63. During its lifetime it has enjoyed a steady and continuous growth and each year has shown a substantial increase in both its gross and net revenue. * * * The following is a statement of the capitalization and earnings of the company, including its share of the gross and net earnings of other utility companies not wholly owned by the company, for the twelve months period ending June 30, 1931:

"CAPITALIZATION.

| | |
|---|---|
| "Bonds outstanding in the hands of the public— | $848,500.00 |
| "Collateral Notes | 62,000.00 |
| "Preferred Stock (all issues) | 761,500.00 |
| "No Par Common Stock (book value) | 374,507.86" |
| (Our computation) | $2,046,507.86 |

"EARNINGS FROM OPERATIONS.

| | |
|---|---|
| "Gross Revenue | 428,092.34 |
| "Operating Expenses, maintenance, taxes, interest on bonds and gold notes | 364,722.62 |
| "Net income available for the payment of dividends and other corporate purposes | 63,369.72" |

"As shown by the above statement, the net revenue of the Company after the payment of costs of operation and maintenance, taxes, interest or bonds and other funded indebtedness, and providing a reserve for depreciation, is ample to meet dividend requirements upon all series of Preferred Stock outstanding, including this issue. * * *

"Middle States Utilities Company, Securities Department,
Dows Building, Cedar Rapids, Iowa."

"Exhibit U was also sent to Gregg. Among other statements therein were the following:

"MIDDLE STATES UTILITIES Co.

"Chartered by the State of Delaware.

"Cedar Rapids, Iowa.

"September 30, 1929.

"Dear Stockholder:

"By becoming a stockholder in our Company you have shown your confidence in the future of our organization and have become a partner in this business. We feel, therefore, that you should be advised from time to time in regard to the progress of our Company and its plans for future development and expansion. We are pleased to inform you that about a year ago our Company acquired the business of the Clarke County Mutual Telephone Company at Osceola and that recently we also acquired the local exchange of our competitor, the Northwestern Bell Telephone Company. The business of these two companies have been consolidated and are now located in a new building which was purchased by the Company. * * *."
(Then follows a statement of plant purchases and expenditures in nine towns in Missouri and six in Iowa, totaling $171,879.14, including $38,418.00 for the acquisition of the property at Osceola.) " * * * Certified Public Accountants of Indianapolis, Indiana, have audited the business of the Company and in their report they show an estimated increase in revenue during the next year of approximately $53,000. We believe their estimate is conservative as the gross earnings of the Company during the last six months have shown a sufficient increase so that the last year's business should equal the estimate made by this firm. * * *

"Middle States Utilities Company,
"By John A. Reed, President."

Exhibit V stated that "the best indication of the progress which the Company is making is the increase in the gross

revenue for the twelve months ending September 30, 1929, which was $353,757.92." Exhibit W was another statement dated June 4, 1931, and sent out about that date. Exhibit X was sent out about June 30, 1932, and showed the earnings of the defendant company from January 1, 1932, to March 31, 1932. The gross income for that period was $93,583.72. The operating expenses were $58,914.40 and the balance after paying operating expenses was $34,669.32. Plaintiff introduced in evidence Exhibits T, U, V, W and X, over the objection of the defendant that *"they are not properly identified or not shown to be correct, incompetent, irrelevant and immaterial."* (Italics ours.)

During the periods covered by these exhibits, prepared and sent out from the appellant's office and indicating a prosperous business, the defendant offered to prove by the testimony of an utilities' accountant from Indianapolis, that if permitted to testify from the rejected Exhibits 2 to 8, he would state that they show "that on December 31, 1930, the surplus of the company [defendant] was $1,438.82; that as of December 31st, 1931, the surplus account became a deficit or a red figure to the amount of $45,806.91; a deficit at the end of 1932 of $48,645.96; * * * that as of December 31, 1930, the defendant had cash in the amount of $1.97; as of December 31, 1931, cash to the amount of $2,246.35; as of December 31, 1932, cash amounting to $971."

From the testimony of Davis it appears that when the Utilities Holding Corporation transferred telephone properties to the various subsidiary companies there was no consideration paid, but the property would be charged to the transferee on the books of the transferor at some figure. Just who fixed the amount of these figures or how they were calculated does not appear. Later the subsidiary companies would issue mortgage secured bonds on the assets transferred to them, and would then transfer these bonds to the appellant. With these bonds as a basis the appellant would then issue its Cumulative Preferred Stock, such as was sold to the appellees and many others. The appellant did not retain the proceeds of its stock sales in its own treasury. In fact, though organized in 1926, it never

had a bank account until after November 30, 1931. The proceeds of all of its stock sales, and they amounted to several hundred thousand dollars, were turned over to the Utilities Holding Corporation. Out of these proceeds credits were entered against the charges that had been made against the subsidiaries. When the quarterly dividends were to be paid on the appellant's preferred stock, the Utilities Holding Corporation made a special deposit in an amount just sufficient to meet the dividend requirements. The record before us does not disclose the complete disbursement of these funds.

■ I. Defendant's Exhibits 2 to 8 inclusive, which were the books of account of the appellant alone, were rejected as evidence, upon the objection of the plaintiffs that they were incomplete and incorrect, and did not include all of the records and books necessary to ascertain the financial condition of the appellant. In support of the objection, in addition to the matters already shown herein, the plaintiffs clearly established their inadmissibility as a basis for the proffered testimony of defendant's accountant respecting the assets or liabilities of the appellant, or its deficits or surpluses, or that performance of its alleged repurchase agreements with the appellants would have impaired its capital, by the testimony of the witness Davis. Respecting Exhibit T this examination appears:

"Q. Can you show me from any of these books you brought in here [Ex. 2 to 8] any statement that will show the gross revenues of this company? A. No, not for the consolidated companies, I can't.

"Q. Do you mean to tell me that they were sending out to the owners of these preferred stocks a statement like Exhibit 'T' and yet you didn't have any earnings such as Exhibit 'T' showed you had? A. The figure is a combination of the gross revenues from several companies and not this one company only.

"Q. Doesn't it state 'This company's share of the earnings that isn't wholly owned by it?' A. That is what it says.

"Q. It says that is *this company's* income doesn't it?

A. This company's income, and its share of the gross and net earnings of the other Utilities Companies that would be income.

"Q. Where in your book does that show that? A. *It doesn't show it because that isn't on these books; it is earnings. Those books are at the present time, I think, in Plattsburg. That is the books of the subsidiary companies.*

"Q. *You haven't got the one here that shows all of its income?* A. *No.* * * *

"Q. Now the assets of the company were how much? A. The total assets of the company as of June 30, 1931, $2,215,243.63. * * *All of the books of the company are not here.*

"Q. *In other words it takes the books of all of these operating companies to get the correct condition of this particular defendant on June 30, 1931?* A. *Probably would, to get a complete and correct, full complete statement.* * * *

"Q. *This statement here* [Ex. T] *is the statement of this defendant company, isn't it, gotten out the 30th of June, 1931, to show the true condition of this company.* A. *Evidently; * * * it would be some one in my office that would furnish the information from which this Exhibit 'T' is gotten up.* * * *

"Q. You wouldn't be able to show me any record to show why that $63,369.72 of net income for the particular year ending June 30, 1931, wouldn't be available to pay Earl Gregg and his mother, would you? A. *No, sir, I couldn't, not from these books alone.* * * *

"Q. This Exhibit T was sent out by the company, *this defendant company,* to sell another hundred thousand dollars worth of stock some time after June 30, 1931, wasn't it? A. I presume it was.

"Q. Exhibit 'U' was a statement sent out by this defendant company under date of September 30, 1929, to show the different properties that the defendant company owned at that time, wasn't it? A. Yes, sir."

Referring to the figures $353,757.92 in Exhibit V, this witness testified:

"Q. *You would have to have the books of all these companies to show the true condition of this company during that time wouldn't you? A. Yes, Sir. These books don't show the consolidated figures of all of the companies.*"

With reference to an item in March 1938, he testified:

"A. The record of that would be on the books of the Middle States Utilities Company of Iowa. That is all I would have here. I would not be able to tell from my record here what additions and improvements were sold to the Middle States Utilities Company of Iowa. * * * The same would be true of the Middle States Utilities Co. of Missouri.

"Q. *Is there anything in the books of this company to show what property it owned on March 1, 1931, just on this defendant company's books? A. I think not. You would have to go to the books of all of the companies to show the consolidated situation. They were run as consolidated companies,* in one sense of the word."

As heretofore stated the only books offered by the defendant were its Exhibits 2 to 8 inclusive. None of the other books which the witness Davis testified were essential to ascertain the true and complete financial condition of the defendant at the times pertinent to these actions, or at any other times, were offered in evidence, or were in the courtroom, or were available to the appellees for examination. We are not holding that it is necessary to bring into court all of the slips or memoranda pertinent to any entry. Nor are we departing from holdings in Shea v. Biddle Improvement Co., 188 Iowa 952, 176 N. W. 948; Younker Bros. v. Meredith, 217 Iowa 1130, 253 N. W. 58; Farmers Nat. Bank v. Pratt, 193 Iowa 406, 186 N. W. 924. Neither do we hold that a competent person who has examined voluminous books of account or records may not testify as to a tabulation or a summarized statement or finding on some particular matter. State v. Cadwell, 79 Iowa 432, 441, 44 N. W. 700; State v. Brady, 100 Iowa 191, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560; Iowa Business Men's Assn.

v. Fitch, 142 Iowa 329, 335, 120 N. W. 694; State v. Niehaus, 209 Iowa 533, 539, 228 N. W. 308; State v. Dobry, 217 Iowa 858, 864, 250 N. W. 702; 2 Wigmore, Evidence, section 1230. But we do hold that before such testimony is offered the books and records from which such statement is prepared or on which such testimony is based should be in evidence, or at least in court or available to the party against whom it is offered. Such was the record or the holding in our cases above cited with respect to this rule. Wigmore says:

"Most Courts require, as a condition, that the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in the court, or at least be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available." 2 Evidence, section 1230.

II. Under its second assignment of error the appellant contends that any cause of action, which the plaintiffs may have had because of the alleged repurchase agreements, accrued at the time the agreements were made, and that the statutes of limitation began running at that time, and that since the agreements were verbal, and the actions were not begun until more than five years thereafter, the actions were barred. This contention is bottomed upon the theory that since the agreement was that the defendant would repurchase the stock and repay the purchase price on demand, the question is ruled by Hall v. Letts, 21 Iowa 596; Citizen's Bank v. Taylor, 201 Iowa 499, 207 N. W. 570; Lovrien v. Oestrich, 214 Iowa 298, 242 N. W. 57; Dean v. Iowa-Des Moines National Bank & Trust Co., 227 Iowa 1239, 281 N. W. 714, 290 N. W. 664. The first case was for money loaned on demand, and the second case involved a promissory note payable on demand. The third case involved a promissory note payable 30 days after demand. For a great many years it has been an almost universal rule of the law merchant that demand loans and instruments of the kind involved are due and

payable as soon as executed, and that a cause of action thereon then accrues, and the statute of limitation against the maker runs from that time. The words "on demand" serve the same purpose as the words "payable in ninety days", or "payable in one year", or on a specified date. All such words simply fix the maturity of the obligations. A demand is not necessary with respect to a note where the maturity is definitely specified, and neither is a demand necessary where the instrument recites that it is payable "on demand", since the latter phrase has, by mercantile custom, and long usage, come to mean that the instrument is due, payable, and matured when made and delivered. In the case of a promissory note payable on demand there is an absolute existing indebtedness on the part of the maker, which is in no way dependent upon a demand, nor in any way augmented by a demand. In other words the demand neither gives rise to nor adds to the liability of the one obligated. In such case the cause of action has both arisen and accrued on the delivery of the instrument and the statute of limitation runs from that time. For like reasons the holding in the Dean case with respect to the cashier's check and the bank draft has no application here.

The appellant also urges upon us in support of its contention that the statute of limitations has barred the actions, such cases as Baker v. Johnson County, 33 Iowa 151, Prescott v. Gonser, 34 Iowa 175. It was cases of this type that the author had in mind in 37 C. J., section 343, where he stated:

"Where the demand is a preliminary step referring only to the remedy *and not to the right,* the action will be barred if the demand is not made within the statutory period. This rule is applied to a cause of action against a county, state, or other municipal or similar body, where the presentment of a claim or a demand and refusal of payment are necessary to make the remedy by action presently available, to the necessity for a demand and refusal to perform an official duty before the institution of mandamus proceedings, and to the necessity of obtain-

ing leave to sue in those cases where such leave must precede the bringing of an action''. (Italics ours.)

In Baker v. Johnson County, supra, the plaintiff had fully completed his services against the county and was entitled to his pay. The liability of the county to him was complete. Subsequently a statute was passed requiring unliquidated claims to be presented to the board of supervisors before suit. He withheld the presentation of his claim until the statute of limitations had run. He insisted that ''as he could not have brought his suit until his claim was presented, the statute did not begin to run until that was done.'' But the court rightly held that ''the statute simply requires that an additional step shall be taken, something else shall be done, in pursuing the remedy by action.'' [33 Iowa 151, 155.] The presentation of his claim to the board did not initiate nor add to the county's indebtedness, nor did it pertain to his right, but it was only a preliminary step having to do solely with his remedy.

In Prescott v. Gonser, supra, the board of supervisors had allowed the plaintiff's claims and had directed its clerk to issue warrants therefor. He did this but neglected to impress on them the seal of the county. Over five years later the plaintiff presented his warrants to the county auditor and demanded that he affix the county seal, which was refused. He then brought an action of mandamus, insisting that his cause of action did not accrue until the demand and refusal. The distinction between that case and others like it, and the case before us was correctly and very clearly stated by the court in that case, in the following language [34 Iowa 175, 180]:

''So, in this case, the plaintiff's right to demand of the clerk of the board of supervisors *the performance of the duty omitted by him existed and was complete at the time the warrants were issued. It was the legal duty of the clerk then to affix to the warrants the seal of the county,* and the plaintiff had the right then to demand the performance. The omission of this official duty is the ground of plaintiff's action. The neglect of the officer to affix the seal of the county to the warrants consti-

tuted the injury to the plaintiff, for which the law afforded him a remedy by action. He could have commenced proceedings at once to compel performance. *True, as a preliminary step in his proceeding, a demand was necessary before he could be entitled to the extraordinary writ of mandamus; but no demand was necessary to create the duty required of the officer. It was as much his duty to affix the county seal to the warrants, at the time they were issued, as it was after demand; and the issuance of the warrants without the proper seal affixed was a breach of official duty, which a subsequent demand did not augment.*

*"The demand by plaintiff was not necessary to create the duty, but only as a preliminary step to the enforcement of the remedy* for a breach of official duty, *which breach was complete without a demand.* [Italics ours.] The demand was to be made by the plaintiff. This act devolved upon him as much as the act of procuring an original notice to be served upon the defendant, and each was necessary as preliminary to the right to the writ of mandamus. To allow him to suspend the operation of the statute of limitations by his own neglect to make demand, would be to permit him to take advantage of his own wrong.''

Other decisions of this court coming within the rule just stated are Hintrager v. Hennessey, 46 Iowa 600; Beecher v. Clay County, 52 Iowa 140, 2 N. W. 1037; Lower v. Miller, 66 Iowa 408, 23 N. W. 897; First National Bank v. Greene, 64 Iowa 445, 17 N. W. 86, 20 N. W 754; Hintrager v. Traut, 69 Iowa 746, 27 N. W. 807; Great Western Telegraph Co. v. Purdy, 82 Iowa 430, 50 N. W. 45, 162 U. S. 329, 16 S. Ct. 810, 40 L. Ed. 986.

The rule announced and applied in all of the cases above named has no application to the case· at bar. In this case the appellant sold and delivered its certificates of stocks to the appellees and received from them in payment therefor the purchase price agreed upon. As an inducement to the purchase, and as a part of the transaction and a part of the consideration, the appellant agreed to repurchase the stock for the original purchase price and to pay that sum to the appellees at any time

they made demand therefor. In other words the agreement was to reverse the original transaction. Instead of the appellant delivering the stock and getting the money, the appellees would deliver the stock and get the money. The sale of the stock to the appellees was a closed transaction. The purchasers could go their way and call the transaction closed and keep the stock, or dispose of it to someone else. It is true that they had a potential, incomplete, inchoate, unaccrued right against the appellant, but that right did not become absolute, complete, consummated, or accrued, until they demanded the fulfillment of the promise and tendered the stock to the appellant. Such action was necessary on their part before their causes of action were accrued against the appellant. What the appellees had was in the nature of an option, which could be put into effect only by exercising it. It was the offer of a proposition, which required no performance upon the part of the appellant, until it was accepted by the appellees. Until that time there was no existing absolute liability upon the appellant. It was but a conditional liability which required an acceptance of the offer or a demand to repurchase, in order to fix the liability. Appellees' cause of action against the appellant did not accrue until it had repudiated its offer by refusing the demand to repurchase. The statute of limitations did not begin to run until that time. The fact that the offer to repurchase was a part of the original transaction, and that the right and cause of action which the appellees seek to prosecute herein, may be said to have "arisen" at that time, does not mean that the cause of action "accrued" at that time. This thought was expressed by Justice Weaver in Moran v. Moran, 144 Iowa 451, 460, 461, 123 N. W. 202, 205, 30 L. R. A., N. S., 898, as follows:

"While technically speaking there is perhaps no such thing as a 'cause of action' on a promissory note until it is due and the holder is entitled to sue thereon, there is a sense in which such cause exists from the moment when the promise becomes a legal and binding obligation. True, it is an imperfect or inchoate right, but it is none the less real. The right to institute

action 'accrues' when by maturity of the note and default in payment the holder may maintain a suit thereon, but it 'arises' or has its origin in the transaction which brought the obligation into existence. The two phrases—'cause of action accrues' and 'cause of action arises'—are both used in our statute, and in a manner which clearly indicates an attempt to express different ideas, and the distinction we have above indicated effectuates what we think was the apparent legislative purpose. We are not without precedents in point.''

The contention of the appellees that their cause of action herein did not accrue until the acceptance of the offer and the demand to repurchase is fully and definitely sustained by the decisions of this court and of other courts. The case of Security Savings Bank v. Workman, 188 Iowa 576, 578, 176 N. W. 307, 308, was an action at law to recover the purchase price of shares of stock sold under a written agreement to repurchase when the employment of the vendee by the vendor ceased. Speaking through Justice Ladd, the court said:

''Plainly enough, the company binds itself to purchase, in the event of the discharge or resignation of Workman; but whether the latter shall sell is left optional with him, and, until he shall elect to avail himself of the company's agreement to buy, he retains the stock, subject to the lien created by the contract. In so far as appears, Workman, though having ceased to work for the company, has not indicated any purpose of availing himself of its undertaking to purchase, and still retains the title, as stated. In other words, the agreement, in so far as the sale of the stock is concerned, *amounted to no more than an option to sell; and, until Workman elected to sell, the proposed purchase price did not mature, nor even assume the dignity of an indebtedness. Ordinarily, in such a situation, the stock must be tendered as a condition precedent to the recovery of the purchase price.''* (Citing cases.) (Italics ours.)

The case of Doughty v. Law, 178 Iowa 840, 842, 160 N. W. 226, 227, was also an action at law to recover the purchase

price on a written agreement to repurchase at any time within two years. The court said:

"As a condition precedent to the maintenance of this action at law, then, plaintiff, as I think, must have returned the stock to defendants or have tendered the same. * * * Also, they [the majority of the court] say that this is not a case of attempted repudiation or rescission, *but a mere adoption by the plaintiff of a right expressly contracted.*" (Italics are ours.)

So in this case the plaintiffs are merely asking for the enforcement of a right for which they paid as a part of their contract.

Reitz v. Brouhard, 198 Iowa 37, 38, 199 N. W. 420, 421, was an action at law to recover the purchase price of corporate stock under a written agreement to repurchase. In speaking of the nature of the transaction and the rights of the parties, the court, through Justice Vermilion, said:

"It is the contention of the appellant that the writing is nothing more than an offer to buy the stock, and that an acceptance within the time fixed in the offer was necessary, to give it the force and effect of a contract. The instrument on its face, and according to the understanding of the parties, was an option, given in consideration of his original purchase of the stock, to the plaintiff, to resell it to the defendant. Security Sav. Bank v. Workman, 188 Iowa 576 [176 N. W. 307]. The plaintiff was not obligated to sell, and the defendant could not have enforced a sale of the stock to him. The defendant was only obligated to repurchase the stock according to the terms of his agreement, and the plaintiff could only exercise his option to sell according to its terms. But if he did exercise his option by demanding that defendant repurchase the stock, and by making tender of it, if that was required, at a time when he had a right to do so, the defendant's obligation to buy, as expressed in the instrument, became binding and enforceable. Doughty v. Law, 178 Iowa 840 [160 N. W. 226]; Security Sav. Bank v. Workman, supra."

In Ball v. Keokuk and N. W. Ry. Co., 62 Iowa 751, 753, 16 N. W. 592, 593, action at law was brought to recover damages for wrongfully taking real estate for a right of way. As an equitable defense the defendant pleaded that plaintiff had agreed in writing to give them a deed to the land on demand as soon as the road was located on plaintiff's land. The court said:

"The important inquiry is, therefore, when did the cause of action accrue? The deed was to be executed on demand after the location of the road. No cause of action accrued, it will be conceded, until after demand. * * * Here there is a mere agreement to convey on demand. The plaintiff was not bound to convey until a demand was made."

Other decisions of this court supporting appellees' position that their cause of action did not accrue until the demand upon the appellant to repurchase and its refusal, are Hamilton v. Finnegan, 117 Iowa 623, 91 N. W. 1039; Vrba v. Krall, 187 Iowa 1221, 175 N. W. 4; Calvert v. Mason City Loan & Inv. Co., 219 Iowa 963, 259 N. W. 452 (all stock repurchase cases); Reizenstein v. Marquardt, 75 Iowa 294, 39 N. W. 506, 1 L. R. A. 318, 9 Am. St. Rep. 477. In Deming v. Haney, 23 Iowa 77, defendant sold, and by bond agreed to convey, to plaintiff a tract of land, for down and deferred payments. He tendered payment in full in November 1856 and demanded deed, which the defendant refused to give. Plaintiff brought an action at law in July 1866 to recover what he had paid. Defendant contended that the statute of limitations ran from the date of the contract and barred the action. In affirming a judgment for the plaintiff, the court said [23 Iowa 77, 80]:

"Defendant's undertaking was to make a deed, not, it is true, upon demand, and yet, without a demand, plaintiff could not have treated the contract as violated and recovered damages for the breach. This being his contract, it is not as though he had given a note for money payable on demand (in which

case the statute would run from the date of the note), but rather a case where there was no liability until demand, on which the statute would run, not from the time of the promise, but of demand. In other words, the ten years is to be counted from the time when plaintiff could have commenced his action; and, as this was less than the statutory period, it was not barred.''

Appellant has quoted an excerpt from 16 California Jurisprudence 492, 494, but it fully supports the view of appellees in this: ''It has been said that a distinction may well be drawn, so far as the statute of limitations is concerned, between cases in which a demand is merely a preliminary requirement to the bringing of the suit, *and those in which a demand is a condition precedent to a right, as to a right to a return of property. * * * Where a demand is an integral part of a cause of action, the statute of limitations does not run until demand is made.''* (Italics ours.)

In Oaks v. Taylor, 30 App. Div. 177, 179, 51 N. Y. S. 775, 776, plaintiff bought shares of stock, and defendant in writing agreed to buy them back at any time the plaintiff should desire him to.

''The defendant's argument rests upon the assumption that since the plaintiff had the right to exercise his option at any time, therefore his right to make the demand was complete the instant the contract was made. *But we think a distinction exists between the plaintiff's right to exercise his option and the actual exercise of it; that the contract contemplates that he should have at least a reasonable time in which to exercise it; that until he should wish or desire the defendant to buy and take back the stock, his right of action did not arise or exist, and hence the condition precedent to the necessity for a demand did not exist.* It would not be reasonable to hold that the right to make the demand was complete before the condition making it necessary had occurred. *The case is different from a promissory note payable upon demand, for there the promise of the maker to pay is absolute,* and the right to make

the demand is complete the instant the note is made. Mills v. Davis, 113 N. Y. 243, 21 N. E. 68. *Here the promise to buy back and pay is not absolute, but conditioned upon the plaintiff's wish or desire, which may never exist.*"

Appellees' contention is stated by the two following excerpts from 37 Corpus Juris, page 958: "* * * where the status of the parties is such that the attitude of one of them cannot be wrongful with reference to the other until the latter's rights are in some way denied or opposed, or where the nature of the contract and the situation of the parties require that it be adjudged that the trust or obligation is a continuing one which is not violated or broken until there is a refusal to honor a demand, then the demand creates the present liability and the statute runs from such demand, but not until then * * *."

Section 346, page 967, [37 C. J.] is as follows: "Where a party may call for performance of the agreement on the part of another only upon a tender or offer to perform his own agreement, there can be no breach of the contract by the one until such offer or tender by the other and the statute will not begin to run until that time, although it does begin to run when the offer of performance is refused. * * *"

We are fully satisfied that appellees' cause of action did not accrue upon the verbal agreement to repurchase, until the demand was made upon the appellant to perform that agreement, and it refused. Since it was an unwritten contract it was necessary that the action thereon for the breach be brought within five years from its accrual. The stock purchases and verbal repurchase agreements were made from February 1, 1928, and at intervening times until October 11, 1929. There was neither pleading nor proof, nor any claim made, nor argument, on the part of the appellant, that the appellees waited an unreasonable length of time before making a demand to repurchase. That question is therefore not before us.

That such a plea would not have availed the appellant, see Wilson v. Iowa Southern Util. Co., 228 Iowa 724, 293 N. W.

77, and Smith v. Middle States Util. Co., 228 Iowa 686, 293 N. W. 59.

It appears without dispute that on or about December 27, 1930, Gregg took 15 shares of his stock to the Iowa State Bank, and had its cashier send them to the appellant for repurchase. This was the first demand. Later he made demand upon the appellant to repurchase all of his stock as well as all belonging to his mother. The appellant refused to repurchase any of it except that they canceled a certificate belonging to his mother for four shares, and issued her a new one on March 10, 1931, for two shares and sent her $200 for the other two shares. The appellant offered no evidence to contradict any of the matters. They stand uncontradicted, and unimpeached by improbability or circumstances. The appellant has in no way made any claim of laches or estoppel. The actions were begun prior to November 6, 1935, within less than five years from the time demand for repurchase was made, and we must hold that there is no merit in the second assignment of error.

III. Appellant's third assignment of error is stated thus: "The court erred to the prejudice of the defendant in directing a verdict in favor of the plaintiffs at the end of all of the testimony upon motion of the plaintiffs. The motion for this verdict is found at Abstract page 114, line 10, to Abstract page 118, line 22 * * *. The evidence is set out under the first division of this argument."

This is a blanket or omnibus assignment of error, and it will not be considered by us. As noted the motion covers four pages. It contains ten separate grounds. That it does not comply with our Rule 30 is clearly shown by numerous decisions of the court. We call attention to a few of them. Morrow v. Downing, 210 Iowa 1195, 232 N. W. 483; Peoples Trust & Savings Bank v. Smith, 212 Iowa 124, 236 N. W. 30; Brenton v. Lewiston, 213 Iowa 227, 236 N. W. 28, 238 N. W. 714; Rawleigh Medical Company v. Bane, 218 Iowa 154, 254 N. W. 18.

But if the claimed error were properly assigned we find no basis for it in the record. No witness and no item of testi-

mony disputes the fact that the stock was purchased and paid for just as pleaded and testified to. The money was received by the appellant. All of it was paid for by checks excepting five shares. The checks were payable to the appellant and the canceled checks with the indorsement of the appellant were in evidence. The receipt of some of these payments appeared in defendant's books. One of the representatives and employees of the appellant testified to each sale and to the receipt of the purchase price of all of the stock sold, and of its remittance to the home office of the appellant. Both he and Gregg testified to the making of the repurchase agreements at each sale. He also testified that he and Brownell sold between $60,000 and $65,000 worth of this stock to approximately 20 persons in Osceola and vicinity, and that the same repurchase agreement was made with each of them. Stock had been repurchased and the money paid back whenever demanded prior to the failure of the Simmons bank. Two of Mrs. Bishop's shares were repurchased, and the rest of her stock was returned to her. Demand to repurchase and tender all of the stock was made within a reasonable time, and performance was refused by appellant. There is no testimony or witness disputing or contradicting any of the above stated matters of fact. Under the record made no verdict of a jury against the plaintiffs on any of these issues could possibly stand. To hold otherwise would be contrary to the rule so well stated by Justice Hamilton in Baker v. General American Life Ins. Co., 222 Iowa 184, 188, 268 N. W. 556, 558:

"But when the evidence all points in one direction, is not in material conflict on the issues involved, and there are no circumstances which tend to impair or impeach the same, and is not susceptible of inherent weaknesses, improbabilities and incongruities, which in and of themselves naturally arise, to contradict or impeach the weight and credibility of the utterances of the witnesses, then it can most certainly be said as a matter of law that the record presents a case about which the minds of reasonable men cannot differ, and the court is, under

such circumstances, warranted in directing a verdict, and there is no sound principle standing in the way of such action on the part of the court."

And by Justice DeGraff in Kern v. Keifer, 204 Iowa 490, 492, 215 N. W. 607, 608:

"A verdict should be directed: 1. Where but one reasonable conclusion can be drawn from the proof adduced. 2. Where the questions of fact are clearly established by unconflicting evidence. 3. Where there is no substantial evidence to overcome a prima-facie case. 4. Where by giving the opposite party the benefit of the most favorable view of the evidence the verdict against him is demanded."

The judgment is therefore affirmed.—Affirmed.

HAMILTON, C. J., and SAGER, HALE, OLIVER, MILLER, and STIGER, JJ., concur.