# IN THE SUPREME COURT OF IOWA

No. 47 / 04-0643

Filed April 7, 2006

**K & W ELECTRIC, INC.**,

    Appellant,

vs.

**STATE OF IOWA**,

    Appellee.

---

Appeal from the Iowa District Court for Black Hawk County, Leonard D. Lybbert, Judge.

Property owner appeals dismissal of tort and inverse condemnation claims against State. **AFFIRMED.**

John J. Hines of Dutton, Braun, Staack, Hellman, P.L.C., Waterloo, for appellant.

Thomas J. Miller, Attorney General, and Noel C. Hindt and Richard E. Mull, Assistant Attorneys General, for appellee.

**TERNUS, Justice.**

The appellant, K & W Electric, Inc., appeals an adverse summary judgment ruling on its damage claims against the appellee, State of Iowa. K & W sued the State on theories of negligence, violation of Iowa Code section 314.7 (1999), and inverse condemnation, claiming a highway construction project undertaken by the Iowa Department of Transportation (DOT) in the vicinity of the plaintiff's premises caused flooding that damaged the plaintiff's property. The district court held the plaintiff's claims were time barred, *see* Iowa Code § 614.1(4), and the defendant was immune from tort liability under Iowa Code section 669.14(8). We affirm.

I. *Facts and Prior Proceedings.*

The plaintiff is an electrical contractor whose place of business is at 1127 Lincoln Street in Cedar Falls, Iowa. Its business premises include a large steel building that houses an office, shop, and storage facilities. The plaintiff's property is located in the 100-year flood plain of the Cedar River near a diversion channel of the river.

The Cedar River has a long history of flooding in Cedar Falls, with the highest recorded flood prior to the events giving rise to this litigation occurring in 1961. In 1984, the Federal Emergency Management Agency (FEMA) prepared a flood insurance study of the city to investigate the existence and severity of flood hazards and to assist the community in promoting sound flood plain management. The study included a flow-frequency analysis, flood profiles, and floodways for each channel. A floodway, according to the FEMA report, "is the channel of a stream plus any adjacent flood plain areas that must be kept free of encroachment so that the 100-year flood can be carried without substantial increases in flood heights." Under federal standards, a substantial increase is an increase in excess of one foot.

In the early 1990s, the DOT undertook an extensive highway construction project involving multiple interchanges between highways 218, 58, and 57 over and near the Cedar River and the Cedar River diversion channel. Some of these structures were just a short distance from the plaintiff's property. Using data from the FEMA report, engineers designed the bridges and structures crossing the river and diversion channel to span the floodway without increasing a 100-year flood by more than one foot. The designs were approved by the Iowa Department of Natural Resources, and the project was constructed according to design.

In April 1993 heavy rainfall and snowmelt caused a flood that matched the record 1961 flood. During this flood, the plaintiff's land was covered by floodwaters of substantial depth. Only the building, which had been built on an elevation approximately one foot above the 100-year flood level established by the Cedar Falls flood plain maps, remained above flood level, but barely so. A second flood occurred in August 1993, but the flood crest was about two feet less than the April flood.

In the aftermath of the extensive flooding in 1993, the DOT sponsored a flood study conducted by Rust Environment and Infrastructure, Inc. The purpose of the study was to review the flooding characteristics of the Cedar River in light of data collected from the 1993 floods and to determine the effects of highway construction in the area. (The report stated that at the time of the April 1993 flood, "the majority of the highway improvements were in place.") The "Cedar River Flood Plain Study," hereinafter "the Rust report," was published on January 25, 1994. The report asserted that the availability of "actual flood high-water elevations and discharge measurements" from the 1993 floods had "resulted in the most reliable computer model ever developed for the Cedar River study area."

Of significance to the present lawsuit, the report found that the effects of construction were significant in the diversion channel and its vicinity, an area that included the plaintiff's business. Three factors were identified as leading to an increased water flow in the diversion channel: (1) backwater created by the highway 218 bridge over the diversion channel; (2) backwater created by bridges on the main channel; and (3) construction of West Lake, which removed a portion of Big Woods Road, creating a less resistant flow path for water to enter the diversion channel. The report concluded, however, that "[a]ll highway structures were sized based on information available at the time of the specific project." It noted the structures for highway 58 and highway 218 through the diversion channel spanned the floodway as identified in the FEMA report. In addition, the Rust report stated that based on the model in use when the improvements were designed, the increase in the floodways was anticipated to be approximately one foot. In actuality, the increase was greater, particularly in the area of the plaintiff's business.

In March 1994, shortly after the Rust report was released, K & W filed a claim with the state appeal board, seeking recovery for damage to a truck caused by the April 1993 flood. In relevant part, its claim stated:

> Our construction business, located at 1127 Lincoln Street, Cedar Falls, was completely surrounded by flood waters on April 2, 1993. The flood waters were caused by highway construction in the area.
>
> In order to keep our business in operation, we used our big heavy duty trucks to transport employees and material from our place of business, thru the flood waters, to our job sites and to our customers. We used the International Truck to go thru the flood water and it developed engine and rear end trouble.

K & W claimed approximately $5600 in damages. The claim was denied, however, and K & W did not pursue further litigation against the State.

On July 22, 1999, heavy rains hit northern Iowa, causing a flood on the Cedar River. K & W's property was again flooded. This time, however, water entered the plaintiff's building, causing extensive damage and necessitating significant cleanup efforts. On January 31, 2000, K & W filed a tort claim against the State for property damage in excess of $32,000. The plaintiff again claimed the flooding and resultant damages were caused by the effects of highway construction. K & W alleged the State was negligent, and it specifically referred to the Rust report and the three construction-related factors identified there as having increased the water flow in the diversion channel. In addition to damages, the plaintiff asked that a plan be developed to protect its property and that the State pay for construction of the solution. The appeal board denied K & W's claim.

This lawsuit was filed on June 11, 2001. The plaintiff reasserted its negligence claim, alleging the DOT failed to exercise due care in the design and construction of the highway projects in the vicinity of the plaintiff's facility. In addition, K & W contended the DOT's construction activities violated Iowa Code section 314.7, which requires that contractors must "use strict diligence in draining the surface water from the public road in its natural channel" when improving any highway. Finally, the plaintiff claimed a permanent devaluation of its property, resulting in an inverse condemnation.

The State subsequently filed a motion for summary judgment on several grounds, but only two are pertinent to this appeal: (1) the design-and-construction immunity of Iowa Code section 669.14(8) applies to the plaintiff's tort claims because the project design complied with generally accepted engineering standards, and the highways were constructed in accordance with the design specifications; and (2) the plaintiff's inverse condemnation claim is barred by the statute of limitations contained in

Iowa Code section 614.1(4) because K & W was aware of the potential for increased flooding since at least the April 1993 flood. Accepting both arguments, the district court granted the State's motion for summary judgment. The plaintiff has appealed.

II. *Scope of Review.*

The district court's ruling on a motion for summary judgment is reviewed for correction of errors of law. *See Christy v. Miulli*, 692 N.W.2d 694, 699 (Iowa 2005).

> Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Id.* (citation omitted). A genuine factual issue "is generated if reasonable minds can differ on how the issue should be resolved." *Id.* A fact is material only if its existence would affect the outcome of the suit. *Faeth v. State Farm Mut. Auto. Ins. Co.*, 707 N.W.2d 328, 331 (Iowa 2005).

To obtain summary judgment, "the moving party must affirmatively establish the existence of undisputed facts entitling that party to a particular result under controlling law." *Griglione v. Martin*, 525 N.W.2d 810, 813 (Iowa 1994). In considering whether the moving party has satisfied this requirement, we accord the nonmoving party every legitimate inference that may be drawn from the record. *Faeth*, 707 N.W.2d at 331. If the moving party has met its burden, "[t]he resisting party must set forth specific facts showing that a genuine factual issue exists." *Grabill v. Adams County Fair & Racing Ass'n*, 666 N.W.2d 592, 594 (Iowa 2003).

III. *Design-and-Construction Immunity.*

We begin with the State's claim that its statutory waiver of sovereign immunity does not apply to the plaintiff's negligence claims by virtue of the

exception contained in section 669.14(8). This statute provides that the state tort claims act does not apply to

> [a]ny claim based upon or arising out of a claim of negligent design or specification, negligent adoption of design or specification, or negligent construction or reconstruction of a highway, secondary road, or street . . . that was constructed or reconstructed in accordance with a generally recognized engineering or safety standard, criteri[on], or design theory in existence at the time of the construction or reconstruction. A claim under this chapter shall not be allowed for failure to upgrade, improve, or alter any aspect of an existing highway, secondary road, or street, to new, changed, or altered design standards.

Iowa Code § 669.14(8). This statute gives the DOT "a state-of-the-art defense with respect to design and construction of [highways and roads]." *Connolly v. Dallas County*, 465 N.W.2d 875, 877 (Iowa 1991) (discussing comparable exception in municipal tort claims act). It also establishes

> that the extent of the public agency's duty for purposes of establishing nonconstitutional torts is measured by the "generally recognized engineering or safety standard, criteri[on], or design theory" in existence at the time of the construction or reconstruction.

*Id.* (quoting Iowa Code § 613A.4(7), (8) (now found at Iowa Code § 670.4(7), (8))).

To demonstrate the applicability of this immunity, the State submitted the affidavit of David Claman, a civil engineer employed by the DOT. Claman stated in his affidavit that the hydraulic analysis and the design of the highway projects in question were based upon data from the 1984 FEMA study. He further stated:

> Based on this analysis, the bridges and structures crossing the main channel of the Cedar River, and the Cedar River diversion channel were sized to span the floodway, defined as the area that must be kept free of encroachments so that a 100-year flood could be carried without a substantial increase, defined as one foot, in flood heights. . . . The project was constructed according to design, in accordance with these recognized,

generally accepted engineering criteria existing at the time of the design and construction.

These statements were corroborated by the Rust report, which stated "[a]ll highway structures were sized based on information available at the time of the specific project," the highway structures "through the diversion channel were sized to span the . . . floodway," and "[t]he floodways developed for both the diversion channel and the main channel of the Cedar River produced approximately 1 foot of increase, as computed by the HEC-2 hydraulic model" developed from the data compiled in the 1984 FEMA study.

In resistance to the State's motion for summary judgment, K & W submitted the affidavit of William Kehe, a professional engineer with experience in hydraulic analysis for the design of bridges, highways, and waterways. Kehe did not dispute the findings and conclusions stated in the Rust report and the Claman affidavit. Rather, he stated that after reviewing the 1994 Rust report, he "[felt] that K & W ha[d] merit in its claim for damages against the DOT." Kehe gave the following explanation for his opinion:

> The [Rust] study uses nationally accepted modeling methodology *validated against the 1993 floods* to conclude that recent highway construction has raised the level of the Q100 flood event in nearly all locations. . . . [T]he study clearly states that Lincoln Street was most adversely affected with a rise of 1.9 feet above the current Flood Insurance Map elevation. The study also concludes the major rise in the controlling flood elevation was caused by the removal of a portion of Big Woods Road thus eliminating an existing temporary detention basin along the Diversion Channel.
> Raising any flood elevation by construction more than one foot is typically a violation of state and federal laws.

(Emphasis added.)

We agree with the district court that Kehe's affidavit is not sufficient to prevent summary judgment on the State's design immunity defense. A

review of the record, including the affidavits submitted by the parties, reveals the following facts pertinent to the DOT's state-of-the-art defense are essentially undisputed. The highway project was designed so that flood levels would rise by no more than one foot. This design was based on a hydraulic model that utilized the most current data available at the time of the design and construction. The one-foot increase projected by this hydraulic analysis was within acceptable parameters for flood plain improvements. The DOT constructed the highway improvements in accordance with the design. A more accurate hydraulic model was developed in 1994 based on the 1993 flood data, data that was not available at the time of the design and substantial completion of the DOT project. The 1994 model shows the highway project has, in fact, raised the 100-year flood level in the vicinity of the plaintiff's business by more than the one-foot rise projected by the models in use prior to 1994. The actual increase in flood levels caused by the highway project exceeds federal standards.

These facts establish the applicability of section 669.14(8) as a matter of law. The plaintiff's claim is "based upon . . . negligent design or specification, negligent adoption of design or specification, or negligent construction or reconstruction of a highway." Iowa Code § 669.14(8). The highway "was constructed or reconstructed in accordance with a generally recognized engineering . . . standard, criteri[on], or design theory *in existence at the time of the construction or reconstruction." Id.* (emphasis added). There is no dispute as to these determinative facts. We think this case presents a classic scenario for application of the design-and-construction immunity.

The plaintiff contends that even if the highway project was designed in accordance with engineering standards, criteria, and design theory generally recognized at the time of the design, the DOT was obligated to

revise its plans when it received the Rust report in January of 1994. The record shows the majority of the work on the highway project had been completed at the time of the April 1993 flood. Another season of construction passed before the Rust report was issued nine months later. We do not think the DOT loses its design immunity when new design standards are developed after the majority of the project has been completed, particularly in view of the legislature's express statement that "[a] claim under this chapter shall not be allowed for failure to upgrade, improve, or alter any aspect of an existing highway, secondary road, or street, to new, changed, or altered design standards." Iowa Code § 669.14(8).

In interpreting statutes, we attempt to avoid an interpretation that would lead to absurd or impractical results. *See State v. Tesch*, 704 N.W.2d 440, 451 (Iowa 2005). Under the plaintiff's suggested interpretation of design immunity, this statutory protection would be lost if one intersection remained to be constructed when additional data became available. This interpretation of design immunity would require the DOT to redesign an improvement after the work is substantially completed, an impractical result given the cost and complexity of such projects. We cannot believe this was the legislature's intent.

Accordingly, we hold the district court did not err in ruling the DOT was immune under section 669.14(8) as a matter of law. The district court properly dismissed the plaintiff's negligence and section 314.7 theories on this ground. Because these claims were properly dismissed on the basis of design immunity, we do not consider the State's alternative argument that these claims were also barred by the applicable statute of limitations.

IV. *Inverse Condemnation Claim and Statute of Limitations.*

A.  *Issue.*  We now consider the district court's ruling that the plaintiff's constitutional takings claim was time barred under Iowa Code section 614.1(4), which establishes a five-year statute of limitations for "injuries to property . . . and all other actions not otherwise provided for in this respect."  Iowa Code § 614.1(4); *see also Scott v. City of Sioux City*, 432 N.W.2d 144, 147 (Iowa 1988) (holding inverse condemnation claims are subject to five-year statute of limitations).  The district court ruled K & W had constructive knowledge of its claim after the 1993 flood, and so the limitations period commenced at that time.  The plaintiff contends the statute of limitations did not begin to run until the 1999 flood.  At the very least, it asserts, there is a factual issue for the jury on when it discovered its claim.  Alternatively, K & W argues the damage to its property "was in the nature of a continuing injury for which recovery was permissible for any damages occurring within five years of filing suit."  Before addressing the plaintiff's arguments, it is helpful to understand the nature of an inverse condemnation claim.

B.  *General principles of inverse condemnation.*  Inverse condemnation is an action pursued by a property owner who claims a governmental entity has appropriated all or part of the owner's property interest without a formal condemnation proceeding.  *Kingsway Cathedral v. Iowa Dep't of Transp.*, ___ N.W.2d ___, ___ (Iowa 2006); *Harms v. City of Sibley*, 702 N.W.2d 91, 97 (Iowa 2005); 9 Patrick J. Rohan & Melvin A. Reskin, *Nichols on Eminent Domain* § 34.03[1], at 34-45 (rev. 3d ed. 2005).  Generally, a taking does not occur unless the invasion of the property is permanent.[1]

---

[1] There is an exception to this general statement for regulatory takings when the offending legislation can be invalidated.  *See Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 321 (Iowa 1998).  The remedy for such "temporary" takings is to declare the legislation invalid, thereby restoring the property owner's future use and enjoyment of the property, and to compensate the property owner for damages occurring before the statute is

*See Kingsway Cathedral*, ___ N.W.2d at ___ ("The *continuance* or *permanency* of the government action sufficient to support the finding of a creation of a servitude has been the determining factor for a finding of a taking. . . . Absence of such continuance or permanency leaves the property owner with nothing but an action in tort."); *cf. Kelley v. Story County Sheriff*, 611 N.W.2d 475, 482 (Iowa 2000) (holding damage to residence door caused by police officer executing arrest warrant was not a taking, distinguishing cases where there has been "a *permanent* deprivation of property, or creation of a *permanent* property interest, as contemplated by [the Takings Clause in the Iowa Constitution]" (emphasis added)). Thus, when flooding results from a government project, "the flooding has been held compensable [as a taking] if there is 'a *permanent* condition of continual overflow' or a *permanent* 'liability to intermittent but inevitably recurring overflows.' " 4A Julius L. Sackman, *Nichols on Eminent Domain* § 14.01[2], at 14-6 (rev. 3d ed. 2005) (emphasis added); *accord Phelps v. Bd. of Supervisors*, 211 N.W.2d 274, 277 (Iowa 1973); 4 Julius L. Sackman, *Nichols on Eminent Domain* § 13.16[5], at 13-149 (rev. 3d ed. 2005). When the flooding is intermittent rather than continual, the fee remains in the property owner, subject to an easement in the governmental entity to overflow the property with water. *Phelps*, 211 N.W.2d at 276; *cf. Bormann v. Bd. of Supervisors*, 584 N.W.2d 309, 316 (Iowa 1998) (holding statutory nuisance immunity for farm operation created "an easement in the property affected by the nuisance" in favor of the operator, and constituted a taking).

Consistent with the permanent character of a taking, the injury caused by such governmental action is measured by the diminution in the value of the property. *See Kingsway Cathedral*, ___ N.W.2d at ___ ("What must be compensated is diminishment of the value of the land."); 9 *Nichols*

_____

invalidated. *Id.*

*on Eminent Domain* § 34.03[3][b], at 34-57. Accordingly, compensation for the taking of an easement is the difference in market value of the property before and after imposition of the easement. *Connolly*, 465 N.W.2d at 878 (stating damages under theory of inverse condemnation include "loss caused by the first flooding and future damages, ordinarily determined by the difference in the value of the land prior to and after the completion of the public improvement"); *accord Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 174-75 (Iowa 2004); 4 *Nichols on Eminent Domain* § 13.16[5], at 13-150; 9 *Nichols on Eminent Domain* § 34.03[3][b], at 34-57.

K & W's inverse condemnation claim is consistent with these principles. K & W alleged the DOT "permanently raised the flood levels of the diversion channel near [the] plaintiff's property making it more susceptible to overflow into the plaintiff's plant for an indefinite period of time into the future." The plaintiff claimed that, "[a]s a result of the highway improvements," its property had lost half its value. K & W sought to recover "an amount sufficient to fully compensate [it] for the permanent loss in value of its property." We now consider whether this claim is barred by the five-year statute of limitations.

C. *General principles governing application of statute of limitations.*

The five-year limitations period begins to run upon accrual of the claim. *See* Iowa Code § 614.1(4). Generally, a claim accrues when "the wrongful act produces injury to the claimant." *Scott*, 432 N.W.2d at 147. This principle is tempered by our discovery rule. *See Borchard v. Anderson*, 542 N.W.2d 247, 250 (Iowa 1996). Under the discovery rule, commencement of the limitations period is delayed " 'until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause.' " *Rieff v. Evans*, 630 N.W.2d 278, 291 (Iowa 2001) (quoting *Woodroffe v. Hasenclever*, 540 N.W.2d 45, 47 (Iowa

1995)).  In other words, the injured party must have " 'actual or imputed knowledge of the facts that would support a cause of action.' "  *Id.* (quoting *State v. Wilson*, 573 N.W.2d 248, 253 (Iowa 1998)).

> "Knowledge is imputed to a claimant when he gains information sufficient to alert a reasonable person of the need to investigate.  As of that date he is on inquiry notice of all facts that would have been disclosed by a reasonably diligent investigation."

*Perkins v. HEA of Iowa, Inc.*, 651 N.W.2d 40, 44 (Iowa 2002) (quoting *Ranney v. Parawax Co.*, 582 N.W.2d 152, 155 (Iowa 1998)).

D.  *Accrual of inverse condemnation claim.*  The State asserts K & W's inverse condemnation claim accrued at the time of the 1993 flood because the plaintiff knew of its injury and the cause of its injury at that time.  The plaintiff argues its inverse condemnation claim did not accrue until the 1999 flood because (1) it did not discover its claim until then, and (2) it was entitled to bring separate, successive actions for each flooding event.  Before addressing the issue of what K & W knew or should have known after the 1993 flood, we consider the plaintiff's contention that each flood gave rise to a new claim at which time the statute of limitations began anew.

In a case involving the flooding of property caused by permanent public improvements, this court stated:

> a cause of action for inverse condemnation accrues the first time damage occurs to lands or chattels real which was in fact caused by the improvement. . . . [T]he person owning the land, crops, or either at that time . . . must seek all damages both present and future in a single action.

*Connolly*, 465 N.W.2d at 878; *accord Thomas v. City of Cedar Falls*, 223 Iowa 229, 237-38, 272 N.W. 79, 83 (1937) (holding because injury to land caused by dam was permanent, "an action therefore should have been commenced within five years after the completion of the dam or at least within five years after the first injury to the property").  The plaintiff claims this statement is

dicta and contrary to the rule that "flood damage is a continuing wrong in which the limitations period runs from the occurrence of each such injury." K & W relies on our decision in *Anderson v. Yearous,* 249 N.W.2d 855 (Iowa 1977), a flood case in which we stated: "Where resultant injuries are recurring *and successive actions will lie,* the limitation period runs from the occurrence of each such injury." 249 N.W.2d at 860 (emphasis added). As an examination of our nuisance cases will illustrate, this rule does not apply to actions for inverse condemnation because successive actions will not lie for a taking.

Initially, we note that *Anderson* was a nuisance case, not an inverse condemnation case. In *Anderson,* the plaintiffs obtained damages and injunctive relief from their neighbor—a private landowner—who had repaired a levee so as to obstruct the natural water flow, resulting in intermittent flooding of the plaintiffs' land. *Id.* at 858. The *Anderson* case is one in a series of decisions by this court discussing when a nuisance or injury is temporary or permanent and the ancillary questions of when a claim for damages accrues and what the appropriate measure of damages is. *See, e.g., Weinhold v. Wolff,* 555 N.W.2d 454 (Iowa 1996); *Hegg v. Hawkeye Tri-County REC,* 512 N.W.2d 558 (Iowa 1994); *Mel Foster Co. Props., Inc. v. Am. Oil Co.,* 427 N.W.2d 171 (Iowa 1988); *Earl v. Clark,* 219 N.W.2d 487 (Iowa 1974); *Patz v. Farmegg Prods., Inc.,* 196 N.W.2d 557 (Iowa 1972); *Eppling v. Seuntjens,* 254 Iowa 396, 117 N.W.2d 820 (1962); *Miller v. Town of Ankeny,* 253 Iowa 1055, 114 N.W.2d 910 (1962); *Riter v. Keokuk Electro-Metals Co.,* 248 Iowa 710, 82 N.W.2d 151 (1957); *Nall v. Iowa Elec. Co.,* 246 Iowa 832, 69 N.W.2d 529 (1955); *Thomas,* 223 Iowa 229, 272 N.W. 79; *Wapsipinicon Power Co. v. Waterhouse,* 186 Iowa 524, 167 N.W. 623 (1918). A review of these cases reveals some basic principles that are helpful in resolving the statute-of-limitations issue in this case.

Whether an injured party is entitled to bring successive actions for damages or must seek compensation for all injuries in one suit depends on the nature of the injury, and to some degree, the nature of the nuisance. Where injuries from the nuisance are intermittent rather than continual, a property owner may bring successive actions to recover damages for each intermittent injury. *See Eppling*, 254 Iowa at 404, 117 N.W.2d at 825. In such cases, "the measure of damages is the diminution in rental value caused by the nuisance together with such special damages, as for discomfort and annoyance, as may result therefrom." *Miller*, 253 Iowa at 1062, 114 N.W.2d at 914.

In contrast,

> "[i]f injuries from a nuisance are of a permanent character and go to the entire value of the estate, there can be but one action, and all damages—past, present, and future—are recoverable therein; in such a case, one recovery is a grant or license to continue the nuisance, and there can be no second recovery for its continuance."

*Weinhold*, 555 N.W.2d at 462 (quoting 58 Am. Jur. 2d *Nuisances* § 273 (1989)); *accord Mel Foster Co. Props., Inc.*, 427 N.W.2d at 175; *Nall*, 246 Iowa at 840, 69 N.W.2d at 533; *Wapsipinicon Power Co.*, 186 Iowa at 527, 167 N.W. at 624. The measure of damages in such a case is the difference in market value of the property immediately before and immediately after the injury-producing nuisance. *See Weinhold*, 555 N.W.2d at 465 (noting special damages may also be recovered); *Mel Foster Co. Props., Inc.*, 427 N.W.2d at 175; *Wapsipinicon Power Co.*, 186 Iowa at 527, 167 N.W. at 624. As we noted in *Weinhold*, "[t]his measure of damages compensates the injured landowner for an interference that is tantamount to a permanent taking." 555 N.W.2d at 465.

It is at once apparent that conduct resulting in inverse condemnation is analogous to a nuisance causing permanent injury because the injury for

which compensation is sought in an inverse condemnation case—loss of the plaintiff's interest in the property—is also permanent in nature. *See Kingsway Cathedral,* ___ N.W.2d at ___. Furthermore, the measure of damages in an inverse condemnation case—diminution in market value—is the same as the measure of damages in a permanent-injury nuisance case. In the latter situation, this court has consistently held that all damages must be sought in one suit. *See, e.g., Connolly,* 465 N.W.2d at 878; *Mel Foster Co. Props., Inc.,* 427 N.W.2d at 175; *Nall,* 246 Iowa at 840, 69 N.W.2d at 533-34; *Wapsipinicon Power Co.,* 186 Iowa at 527, 167 N.W. at 624. The same conclusion, that only one action will lie, is equally applicable to inverse condemnation actions because the resulting injury—a taking of the plaintiff's property interest—can only happen once. Therefore, it is not the type of injury for which successive actions will lie. *Cf. Scott,* 432 N.W.2d at 148 (holding adverse impact on market value of plaintiff's property caused by city zoning ordinance "constituted a single injury"). Thus, this court was correct when it stated in *Connolly* that in an inverse condemnation case, all damages must be sought "in a single action." 465 N.W.2d at 878.

Because the successive-actions rule does not apply here, the five-year statute of limitations for the plaintiff's inverse condemnation claim did not automatically begin anew when the plaintiff's property was flooded for a second time in 1999. Therefore, the pertinent inquiry in this case is: when did K & W discover its claim for inverse condemnation? We turn now to a discussion of that issue.

E. *Application of discovery rule.* In order to succeed on its defense that the plaintiff's inverse condemnation claim is barred by the statute of limitations as a matter of law, the State must demonstrate there is no dispute that K & W had actual or imputed knowledge of " 'the fact of [its] injury and its cause' " prior to June 11, 1996. *See Rieff,* 630 N.W.2d at

291. The summary judgment record reveals the plaintiff had actual knowledge by March 1994 that the April 1993 flood that invaded its land was "caused by highway construction in the area." K & W made this allegation in the claim it filed with the state appeal board on March 14, 1994 for damage to its truck. Thus, by that date, the plaintiff knew of an injury to its real property and its cause.

The plaintiff argues, however, that although it knew the DOT's work had caused flooding on its land, it did not know it had been *permanently* injured. *See* 3 Julius L. Sackman, *Nichols on Eminent Domain* § 8.01[4][c], at 8-60 (rev. 3d ed. 2005) (stating it has been held landowner must institute action within prescribed period "after he or she realizes or should reasonably realize that his or her property has sustained an injury *that is permanent in nature*" (emphasis added)). We question whether this argument has any validity under Iowa law. This court has held that "[w]hen an incident occurs causing minor injuries and later more serious injuries appear," the plaintiff's claim for all injuries accrues for purposes of the statute of limitations upon discovery of the first injury. *See LeBeau v. Dimig*, 446 N.W.2d 800, 802-03 (Iowa 1989). We have also held "that once claimants have knowledge of facts supporting an actionable claim they have no more than the applicable period of limitations to discover all the theories of action they may wish to pursue in support of that claim." *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 352 (Iowa 1987). Whether these authorities preclude the plaintiff's argument is a question we need not answer because we are persuaded K & W had imputed knowledge of its permanent injury long before June 11, 1996, five years before it commenced this action.

The district court concluded the plaintiff "should have known that as a result of [the 1993] flood, the value of its land had been significantly

lessened." The court explained the mere fact "the land had been inundated by the 1993 flood" would "substantially reduce the overall value of the property" in the eyes of prospective buyers. We agree. But even more importantly, we also think K & W is charged with knowledge of the information set forth in the Rust report, information that made it clear the plaintiff's property was at a greatly increased risk of flooding as a result of the DOT's highway construction.

In K & W's 1994 claim filed with the state appeal board, it asserted, "The flood waters were caused by highway construction in the area." We conclude it is indisputable that a reasonably diligent investigation of this claim would have led the plaintiff to the Rust report. *See Perkins*, 651 N.W.2d at 44 (stating injured party is assumed to have knowledge of " 'all facts that would have been disclosed by a reasonably diligent investigation' " (citation omitted)); *Chrischilles v. Griswold*, 260 Iowa 453, 462, 150 N.W.2d 94, 100 (1967) ("The question in any case is . . . What might [the plaintiff] have known, by the means of information within his reach, with the vigilance which the law requires of him?"). This report was prepared for the DOT, the entity responsible for the construction, and was published on January 25, 1994, more than six weeks before K & W filed its claim with the state appeal board and more than a year before the two-year statute of limitations on its tort claim expired. *See* Iowa Code § 669.13 (requiring tort claim against state to be filed within two years of its accrual). Therefore, the information in the Rust report must be imputed to K & W to determine whether it discovered its claim for inverse condemnation more than five years prior to filing this suit.

The Rust report detailed how the highway construction project altered the flooding potential in the area of the plaintiff's business. It stated the water levels in the diversion channel, which is close to the plaintiff's

property, had been increased by the DOT project, an increase that in turn resulted in higher flood profiles. Of particular significance here, the study concluded the flood elevation had increased the most at Lincoln Street where the level was 1.9 feet higher than prior to the highway construction. (K & W's property is located on Lincoln Street.)

The importance of this information to the plaintiff's discovery of its permanent injury is illustrated by a comparison of the contents of the Rust report to the takings claim made in the present lawsuit. The factual assertions made in K & W's petition in support of its inverse condemnation claim are derived from and substantiated by the Rust report. In addition, the plaintiff's expert witness relied principally on the Rust report to support his conclusion that "K & W is faced with an increase in flood depth of 33%" and an increase in flood duration of greater than 33%.

K & W seeks to minimize the Rust report conclusions, arguing the highway project was not completed when the report was published in 1994, and as a result, the plaintiff could not have known that future flooding would occur once the highway project was finished. But the Rust report assumed the completion of the project as designed and made projections of flood elevations on that basis. Consequently, the plaintiff could easily have discovered as early as January 1994 that the completion of the project would exacerbate rather than diminish the flooding potential on its property.

In summary, had the plaintiff undertaken a reasonably diligent investigation preparatory to the filing of its March 1994 claim and its later decision not to file suit against the State, it would have uncovered the Rust report. Therefore, the information contained in that report must be imputed to the plaintiff. K & W would have learned from a review of the Rust report that the 1993 flood was not an anomaly but was the result of a

permanent and significant increase in flood elevations caused by the DOT's project. Because this information would have informed the plaintiff of the permanent nature of the injury to its property as well as its cause, the plaintiff is deemed to have discovered its inverse condemnation claim more than five years prior to filing this lawsuit. The district court did not err in granting summary judgment to the defendant on this basis. *See Estate of Montag v. TH Agric. & Nutrition Co.*, 509 N.W.2d 469, 471 (Iowa 1993) (affirming summary judgment for defendant based on plaintiff's inquiry notice of claim); *Franzen v. Deere & Co.*, 377 N.W.2d 660, 661 (Iowa 1985) (same).

V. *Summary.*

The State has established as a matter of law that it is immune from tort liability for its design and construction of the highway project in question because the highways were constructed "in accordance with a generally recognized engineering . . . standard, criteri[on], or design theory in existence at the time of the construction." Iowa Code § 669.14(8). Therefore, the district court correctly granted summary judgment to the State on the plaintiff's tort claims.

When a property owner seeks recovery for the diminution in value of its property resulting from intermittent but inevitably recurring flooding caused by a government project, the landowner must file its action for inverse condemnation within five years of the date upon which it discovers the injury to its land and the cause of the injury. Here, the plaintiff was on inquiry notice of its claim after its property was first flooded in 1993. Because this lawsuit was filed more than five years later, its inverse condemnation claim is barred by the statute of limitations. Therefore, the district court correctly granted summary judgment to the State on the plaintiff's takings claim.

**AFFIRMED.**