# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2764

_____

Estate of Nell G. Pepper, by the     *
administrator for both Estates, Norma     *
Deeble; Estate of Sterling Gary Pepper,     *
by the administrator for both Estates,     *
Norma Deeble,     *
    *    Appeal from the United States
         Appellants,     *    District Court for the
    *    Southern District of Iowa.
     v.     *
    *
Nancy Pease Whitehead;     *
Pease Family Partnership,     *
    *
         Appellees.     *

_____

Submitted: March 14, 2012
Filed: July 31, 2012

_____

Before WOLLMAN, COLLOTON, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Plaintiffs, the Estate of Sterling Gary Pepper and the Estate of Nell G. Pepper (the Estates), appeal the district court's order granting Nancy Pease Whitehead and the Pease Family Partnership's (the defendants) motion for summary judgment. We reverse and remand.

The parties find themselves in a dispute over the rights to an extensive collection of Elvis Presley memorabilia (the collection). The collection was amassed by Sterling Gary Pepper, Jr. (Gary), who had a deep love for Elvis's music, developed a close personal friendship with Elvis (often referred to as the "King of Rock and Roll"), and served as Elvis's fan club president.[1] Gary often found himself at the center of Elvis's personal life, sitting at the head table at Elvis and Priscilla Presley's wedding reception, posing for photographs with the young couple at Graceland after the birth of their daughter, Lisa Marie, and receiving front row seats to many Elvis concerts.

In 1971, Gary's father, Sterling Gary Pepper, Sr. (Gary, Sr.), died of a heart attack while on security guard duty at the Graceland gates. His death left only Gary's mother, Nell Pepper (Nell), to care for Gary, who suffered from cerebral palsy. Gary's condition adversely affected his daily life, rendering him unable to walk, use his hands, or speak in a manner that could be understood by many persons other than Nell. Nell eventually found herself unable to care for Gary because of the severe depression and periodic manic states she suffered from following Gary, Sr.'s death. Her condition deteriorated to such an extent that she frequently defecated on the floor when upset, ran away from home, constantly banged on doors for lengthy periods, stopped cleaning Gary's wet bed, and allowed the house to fall into a state of squalor.

Meanwhile, in 1974, Nancy Pease Whitehead's (Nancy's) love of Presley's music caused her to move from her home in Cedar Rapids, Iowa, to Memphis, Tennessee, to enable her to absorb the local culture of her idol's hometown. Nancy,

---

[1] Gary played an integral role in founding and developing "The Tankers," a fan club named in honor of Elvis' service with the Third Armored Division stationed in Germany from 1958 to 1960. At the height of its membership, the Tankers' worldwide membership exceeded 5,000.

a licensed practical nurse, frequently spent her days hoping to catch a glimpse of Elvis at the gates of Graceland, where one day she was approached by Carl Nichols, a member of Presley's inner circle. Aware of Nell's inability to care for Gary, Nichols informed Nancy that Gary and Nell needed assistance.

Upon learning of Gary and Nell's needs, Nancy began assisting them in 1976 at their modest two-bedroom bungalow on Eva Street. Nancy slept on the living room couch, worked to improve the home's conditions, assisted Gary with physical therapy, and taught him how to swim and drive. By all accounts, Nancy provided care that was steadfast, loyal, and true. Recognizing the need for additional assistance, Nancy eventually invited her mother, Helen, and brother, Dennis, to also move from Cedar Rapids to Memphis, and the two of them began living with Nancy, Gary, and Nell at the Eva Street house, supporting themselves on Helen, Gary, and Nell's social security and Gary's fan club income. Finding the home inadequate for their needs, the five moved to a house on Dolan Street, next to the home of Presley's father, Vernon Presley, fulfilling Gary's wish of being nearer to Graceland.[2] The house met their every need, and the five lived there together as a family.

Elvis died on August 16, 1977. The death of Gary's idol wrought great change in the lives of the Dolan Street household. On October 28, 1977, Gary and Nell received notice from Vernon Presley that Elvis's estate, charged with the duty of conserving assets for its beneficiaries, could no longer keep Gary on its payroll. At that point, without means of financial support beyond Gary, Nell, and Helen's social security checks, Nancy concluded that they could not afford to continue living in Memphis. Gary and Nancy's relationship became strained when Gary opposed a surgery that Nancy believed he needed to reduce his spasticity. Nancy and Helen

---

[2]The parties dispute who purchased the Dolan Street home. Defendants contend that Helen and Nancy purchased the house, while plaintiffs argue that Gary and Nancy pooled their money to purchase the house.

-3-

eventually decided to return to Cedar Rapids, where Nancy's brother had a house that Nancy, Helen, Dennis, Gary, and Nell could reside in for free. Concerned for Gary and Nell's health and convinced that they would not want to live in the only Memphis nursing home that would take them, Nancy invited them to move to Cedar Rapids with her, Helen, and Dennis. All moved to Cedar Rapids in April of 1978.

Defendants contend that sometime between Elvis's death and the move to Cedar Rapids, John Tate—Nell's nephew and Gary's cousin—traveled from his California home to Memphis, where he visited them on February 3, 1978.[3] Defendants contend that the purpose of Tate's visit was to help Gary consider the above-mentioned surgery. John Tate at some point discussed with the Peppers the possibility of moving Gary and Nell to California as a solution to their care needs. It is unclear to what extent items of the collection were displayed at the Dolan Street house at the time of Tate's visit or whether ownership of the items on display was discussed, though Nancy testified in her deposition that Tate knew of the full extent of the collection.

Also accompanying Gary, Nell, Nancy, Helen, and Dennis to Cedar Rapids was Gary's vast collection of Elvis-related memorabilia. In the summer of 1978, Gary and Nell entered a Cedar Rapids nursing home, which Nancy considered a "holding area" until the Tates could come to take Gary and Nell to California. Gary brought some of his memorabilia to the nursing home, with the remainder of the collection staying at Nancy's home.

---

[3]The Estates also alleged in their Second Amended Complaint that sometime after the Peppers and Peases moved to Cedar Rapids in April of 1978, "Mr. Tate traveled to Gary Pepper's former home in Memphis, Tennessee to pack up Gary's remaining items of property, but found that the home was empty." Second Am. Compl. ¶ 18. The record does not include any evidence of this trip.

At some point, Gary and Nancy discussed the future of the collection. In her deposition testimony, Nancy explained that Gary told her to "keep it for him," and that she did not interpret Gary's statement as transferring possession or gifting the collection to her. Whitehead Dep. at 138. Nancy further testified that she never thought that the collection belonged to her and that Gary "never actually gave" the collection to her. Id. Rather, Gary left the collection at Nancy's house for Nancy to "watch over it" while he planned his upcoming move to California and determined his living arrangements there. Id. at 55. In addition, Nancy testified, "I thought, you know, maybe he wanted it sent to him later when he knew where he was going to be going." Id. at 138. The record does not suggest any contemplation of a finite length of time that Nancy was to hold the property for Gary, or of a specified time for Gary to demand that the property be returned. In any event, according to Nancy, Gary did not want the collection thrown away, so she saved it.

In the fall of 1978, John Tate and his mother, Rebecca Tate (Nell's sister), came to Cedar Rapids from their California home and removed Gary and Nell from the nursing home. Rebecca, after packing all of Gary and Nell's belongings that were in the nursing home, drove the two to California, while John returned by plane. According to John, he believed that the items in the nursing home were "the extent of [Gary's] personal property." John Tate Aff. ¶ 5. Gary took with him to California the memorabilia that he had brought to the nursing home, which consisted of a 14-karat gold bracelet given to Gary by Elvis inscribed "FROM E.P. 12/25/65"; two gold rings; a Rolex Oyster watch given to Gary by Elvis; autographed record covers; Sun Studios records; a home video of Priscilla Presley's baby shower; a "G.I. Blues" album cover autographed by Elvis and his manager, "The Colonel"; photographs of Elvis, Gary, and Nell; and a letter and envelope from Elvis to Gary sent from Germany. The Tates did not inform Nancy of their trip to Cedar Rapids to move Gary and Nell to California. Nancy did not learn of the move until she stopped by the nursing home one night to feed Gary, only to discover that he and Nell were gone.

Gary and Nell remained in California until their deaths on March 29, 1980, and December 29, 1982, respectively. According to John Tate and Norma Deeble (another cousin of Gary's), while living in California, Gary and Nell never had any conversations with them about the existence of the collection in Iowa, and there is no evidence in the record that Gary or Nell discussed the collection with any relatives after moving to California. Gary and his family did not communicate with Nancy after the move to California. Neither Nancy nor anyone from her family contacted Gary's family upon hearing of Gary's death, though Nancy testified that she would have attempted to contact the family had she known where they were. She made no effort to locate the family, but agreed that "a reasonable person would have tried to contact the family." Whitehead Dep. at 57. Defendants do not dispute that in April of 1980, Nancy received a copy of Gary's obituary, which stated where Gary died, the hospital at which he died, and the funeral home where arrangements were being made, as revealed in the following obituary for Gary, which appeared in a Memphis newspaper on March 31, 1980:

> Gary Pepper, a cerebral palsy victim who endeared himself to many Elvis Presley fans because of his longtime adoration of Presley, died Saturday in Long Beach, Calif.
>
> Mr. Pepper, 48, who moved to Long Beach from Memphis about two years ago, died at 11:30 a.m. at Alameda (Calif.) Hospital.
>
> "He's still getting fan letters from people wanting to know where he was. He hadn't been well for about a year. After Elvis died, it was sort of a mess. Gary was a good friend of Elvis Presley and Elvis did wonderful things for Gary, and we appreciated that," John Tate, Mr. Pepper's cousin and guardian, said yesterday when contacted in Long Beach.
>
> "People would write him (Gary) from all over. But since Elvis died, it sort of took the life out of him. He was very faithful to Gary.

Everybody in Memphis had always been good to Gary. It was hard to get him away from Memphis." Said Tate.

Despite his handicap, Mr. Pepper was very independent. He operated a clipping service, learned to drive a car a few years ago, and was on Elvis' payroll as "Fan Club Coordinator and Foreign Correspondent." At one time, he also wrote "Memories of Elvis" for the Graceland Fan Club publication and for "Elvis Monthly," an English publication. He had an extensive collection of Elvis mementos, including autographed pictures and records.

Funeral arrangements are incomplete. Coon's Mortuary in Long Beach has charge.

He leaves his mother, Mrs. Nell Pepper of Long Beach.

Defs.' Reply to Pls.' Statement of Additional Material Facts and Resp. to Defs.' Statement of Material Facts, at 11; Dist. Ct. Doc. 59-5, at 5. At his deposition, John Tate denied speaking to anyone at the Memphis newspaper or making the quotes attributed to him, though he subsequently hedged on whether such a conversation might have occurred. Tate also denied seeing the obituary at any point prior to this litigation.

Nancy acknowledged that "[t]he property has always been Gary's. After he died I really didn't know what to do with it." Whitehead Dep. at 53. Following Gary's death, Nancy thought about giving the property back to Gary's family, but, as recounted above, she made no effort to contact them because, according to her testimony, she "had no way of knowing how to get ahold of them." Whitehead Dep. at 58.

In 1982 or 1983, Nancy gave the collection to her sister, Janet "Jenny" Jorgensen, of Des Moines, Iowa, after Nancy moved and found herself with no place to store the collection. Jorgensen testified that she understood the collection to

belong to her upon receiving it from Nancy. She made no attempt to contact Gary's family.

Jorgensen maintained the collection until she decided to sell it in 2009. At that point, she created the Pease Family Partnership (the Partnership)—an Iowa general partnership—to which she transferred the collection. The Partnership then transferred the collection to an auction house in Chicago, Illinois, where it was entitled the "Gary Pepper Collection of Elvis Presley Memorabilia" and scheduled for sale at auction on October 19, 2009.

The proposed auction caused the collection to receive widespread media publicity. One of Gary and Nell's relatives, Rebecca Bishop, learned about the auction through such coverage and notified her mother, Norma Deeble, and her uncle, John Tate. Deeble and Tate stated in affidavits that they had no knowledge of the collection's existence and Gary's ownership of it until being informed by Bishop.

On October 15, 2009, Tate and Deeble brought a conversion claim against Leslie Hindman Auctioneers, Inc. (the auctioneers) and Nancy in the United States District Court for the Northern District of Illinois, seeking to enjoin the auction and recover the collection for Gary's heirs. The Estates' motion for a temporary restraining order was denied, but the district court ordered the auctioneers to maintain all proceeds from the auction in escrow pending resolution of the conversion claim. At auction, the 181 items composing the collection resulted in a total sale price of $250,465.00, including $28,000 for an Elvis-worn red ultrasuede shirt, $15,000 for a large quantity of Elvis' hair that was cut for his Army tour of duty; $6,000 for an original 1954 record of Elvis' first single, "That's All Right"; $4,000 for original photographs and negatives from Elvis and Priscilla's wedding reception; $600 for a set of Elvis's concert-used handkerchiefs; and $1,400 for two dried white roses from Elvis' funeral.

Following the sale, the auctioneers were dismissed from the suit, the Partnership was added as a defendant, the Estates were substituted for Tate and Deeble as the plaintiffs, and the case was transferred to the United States District Court for the Southern District of Iowa.

The Estates' Second Amended Complaint brought claims for (1) conversion by a bailee, (2) fraud, (3) mislaid or lost property, and (4) failure of bailee to return property. Defendants filed a counterclaim for recovery of the value of preserving the collection during the period it was possessed by them. The district court granted defendants' motion for summary judgment on all claims, concluding that the applicable statute of limitations for the Estates' claims had expired. The district court also denied as moot the Estates' motion for summary judgment on defendants' counterclaim and several of defendants' affirmative defenses.

The Estates have appealed from the district court's order with respect to the conversion claim, arguing that the district court failed to apply governing Iowa law on the statute of limitations issue. The Estates also argue that the district court failed to view the facts in the light most favorable to them when ruling that the discovery rule, which would have tolled the statute of limitations, was inapplicable as a matter of law. In addition, the Estates appeal the denial as moot of their motion for summary judgment.

II.

"We review the district court's grant of summary judgment de novo, applying the same standards as the district court and viewing the evidence in the light most favorable to the nonmoving party." Zike v. Advance Am., Cash Advance Ctrs. of Mo., Inc., 646 F.3d 504, 509 (8th Cir. 2011) (quoting Travelers Prop. Cas. Co. of Am. v. Gen. Cas. Ins. Co., 465 F.3d 900, 903 (8th Cir. 2006)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

A. Whether the District Court Properly Applied Iowa Law in Determining when Running of the Statute of Limitations Commenced

The parties agree that Iowa law governs this diversity action. The Estates argue that the district court erred in applying Iowa contract law in granting summary judgment to defendants on the Estates' claim for conversion by a bailee. Under the Estates' theory, the statute of limitations for demanding return of the bailed property did not begin to run until conversion of the collection occurred.[4] Defendants contend that the district court was correct in ruling that "absent good cause for a delay in demanding return of the Memorabilia either while [Gary] remained in Iowa or after his move to California, the Court finds it reasonable under the circumstances to conclude that demand should have been made during the five-year limitations period" commencing with creation of the bailment in 1978. Dist. Ct. Order of July 14, 2011, at 11.

In Reizenstein v. Marquardt, the Supreme Court of Iowa addressed the event that triggers the running of the statute of limitations in an action for conversion of bailed property. 39 N.W. 506 (Iowa 1888). In 1877, Reizenstein left his gold watch with a watch repairer for safekeeping. Over the course of the next ten years, Reizenstein and Marquardt had various conversations regarding the watch, including

---

[4]Defendants do not dispute the district court's finding that, "[v]iewing the facts in a light most favorable to plaintiffs . . . material issues of fact exist as to whether Gary exhibited 'donative intent' when he told Nancy to 'keep' the property [*i.e.*, the collection], or whether he intended Nancy to hold the property as a *gratuitous bailee*." See Dist. Ct. Order of July 14, 2011, at 9.

Marquardt's expressing his desire to purchase it. Reizenstein consistently refused to sell the watch to Marquardt and demanded its return in 1887. Marquardt refused, whereupon Reizenstein brought a claim for conversion of bailed property. The court held that "[n]o right of action accrued until there was a wrongful conversion of the property," and "the statute of limitations will not begin to run in favor of a bailee until he denies the bailment and converts the property to his own use." Id. at 507. Deeming "[t]he rights and obligations of a bailee of personal property" to be "very much like those of a trustee of a resulting trust in realty," the court noted that "it has always been held that the statute of limitations commences to run in favor of a trustee from the time when he denies the trust, and claims the trust property as his own." Id. (citing Peters v. Jones, 35 Iowa 512 (1872); Gebhard v. Sattler, 40 Iowa 152 (1874)). The court rejected the defendant's argument that the five-year statute of limitations commenced when the deposit of the bailed property was made, explaining that is "the rule as to actions arising upon contracts, express or implied," whereas "the action in this case is in the nature of an action for a tort." Id. (citations omitted). The Iowa Supreme Court subsequently reaffirmed this distinction in Lovrien v. Oestrich by holding that an action for repayment of a promissory note was barred by the five-year statute of limitations commencing on the date of the note because "[n]o question of bailment, or trust, or of contract indicating an expectation that there was to be delay in making demand [wa]s involved." 242 N.W. 57 (Iowa 1932) (citing Reizenstein, 39 N.W. 506) (additional citations omitted).

We conclude that the district court erred by not applying the rule regarding bailments outlined in Reizenstein. The district court held that the statute of limitations began running when the bailment was created in 1978, citing and quoting from that portion of Reizenstein which discussed the rule governing contract actions. See Dist. Ct. Order of July 14, 2011, at 10 (noting that "[g]enerally, when the time for demand is not specified under the terms of the agreement, courts have required that demand be made within the limitations period") (citing Reizenstein, 39 N.W. at 507) ("[U]nless demand be made in a reasonable time, the plaintiff will not be entitled to

-11-

relief; and a reasonable period of time is determined by the circumstances; and where no cause for delay is shown, the time is to be fixed by the statute of limitations."). The district court also relied on Smith v. Middle States Utilities Co., 293 N.W. 59 (Iowa 1940), which involved a suit alleging breach of a repurchase agreement. Id. at 61. In Smith, the Supreme Court of Iowa applied the Iowa rule for contracts, which requires a demand within a reasonable amount of time (generally prescribed by the statute of limitations) as a prerequisite for bringing suit. Id. at 63-64 (citing Reizenstein, 39 N.W. at 507 ("This is the rule as to actions arising upon contracts, express or implied."). The Estates' claim for conversion by a bailee, however, arises in tort, the statute of limitations for which did not commence until a conversion of the collection occurred. See Reizenstein, 39 N.W. at 507.

We note that the district court sought to distinguish Reizenstein on its facts, noting that "the parties in Reizenstein were in regular contact regarding the watch throughout the time period at issue," whereas "there is no evidence that Gary evidenced any desire to reclaim ownership of the Memorabilia after telling Nancy to 'keep' the Memorabilia." Dist. Ct. Order at 10 n.6. Nancy conceded in her testimony, however, that Gary did not intend for her to keep the collection permanently. Moreover, the lack of evidence of a subsequently expressed desire to reclaim the property resulted in part from the fact that Gary died less than two years after creation of the bailment, and the parties dispute whether his heirs (other than his emotionally challenged mother, who died within five years of creation of the bailment) knew of the collection's existence. Whatever the difference in the facts, we read Reizenstein as holding that the statute of limitations for claims for conversion by a bailee does not commence until the alleged conversion occurs.[5]

---

[5]Defendants argue that a reversal of the district court's ruling would require gratuitous bailees in Nancy's circumstances to hold bailed property in perpetuity for the heirs of deceased bailors to claim. They also suggest that a time limitation should be placed on a bailor's claim for the return of gratuitously bailed property. We conclude that these arguments are better left for resolution in a case the facts of which

-12-

B.    Whether the District Court Properly Ruled that the Discovery Rule was Inapplicable

Viewing the facts in the light most favorable to the Estates, the conversion of the collection occurred in either 1982 or 1983 when Jorgensen took possession of the collection.  Under those dates, the statute of limitations would have expired in 1987 or 1988, respectively, unless the discovery rule applies.  See Iowa Code § 614.1(4) (setting five-year statute of limitations for "injuries to property"); Husker News Co. v. Mahaska State Bank, 460 N.W.2d 476, 476-77 (Iowa 1990) (noting that a conversion claim is one for "injuries to property" under Iowa law subject to a five-year statute of limitations).

Iowa applies the discovery rule to toll a statute of limitations.  See Hallet Constr. Co. v. Meister, 713 N.W.2d 225, 231 (Iowa 2006).  "The discovery rule tolls the statute of limitations until the plaintiff has discovered the fact of the injury and its cause or by the exercise of reasonable diligence should have discovered these facts."  Id. (citing K & W Elec., Inc. v. State, 712 N.W.2d 107, 116 (Iowa 2006) (internal quotations omitted)).  "Once a claimant learns information that would inform a reasonable person of the need to investigate, the claimant is on inquiry notice of all facts that would have been disclosed by a reasonably diligent investigation."  Id. (citing K & W Elec., Inc., 712 N.W.2d at 117) (internal quotations omitted).  "Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case . . . . When conflicting inferences can be drawn from the facts, summary judgment is inappropriate."  Kraciun v. Owens-Corning Fiberglas Corp., 895 F.2d 444, 447 (8th Cir. 1990) (quoting Foster v. Johns-Manville Sales Corp., 787 F.2d 390, 393 (8th Cir. 1986) (applying Iowa discovery rule in tolling a statute of limitations)).  The plaintiff bears the burden of pleading and proving the

_____

might render them dispositive of the outcome.

-13-

applicability of the discovery rule, but when a defendant claims a statute of limitations defense in a summary judgment motion, the court "review[s] the evidence presented in the light most favorable to the plaintiffs as nonmoving parties." Id. at 445-46.[6]

The Estates argue that they did not discover the existence of the collection, Gary's ownership of it, and the creation of the bailment until Bishop saw media coverage about the auction in 2009. Defendants argue that the Estates should have developed suspicious minds sooner, based on John Tate's alleged visit to the Dolan Street house, Gary's transporting of various memorabilia to California, and the family's general knowledge of Gary's ties to Elvis, including the information revealed by the alleged interview given by John Tate for Gary's obituary. The district court ruled by way of a footnote that the discovery rule was inapplicable:

> [T]he facts are undisputed that John Tate visited Gary and Nell in their home in Memphis, and therefore was on notice that Gary's Elvis collection extended far beyond those few items Gary had taken with him to the nursing home in Iowa. If John Tate or other heirs wanted these additional items back after Gary's death, a reasonable investigation within the limitations period would have enabled him to contact Nancy in Iowa and locate the remaining Memorabilia. The discovery rule is therefore inapplicable.

---

[6]Defendants argue that the Estates did not satisfy their burden of pleading an exception to the normal statute of limitations period. In their reply to the defendants' amended answer and counterclaim, however, the Estates pleaded in response to the defendants' statute of limitations affirmative defense that they "had no knowledge of potential causes of action and the whereabouts of the property at issue, or any reasonable basis to determine causes of action or that the property was missing until learning of the auction in the news media." Pls.' Reply to Defs.' Am. Answer and Countercl., at 1. We conclude that this statement satisfied the Estates' pleading burden concerning application of the discovery rule.

Dist. Ct. Order of July 14, 2011, at 13 n.8 (citing photos of interior of Dolan Street home showing display of memorabilia in background and deposition testimony in which Tate discusses visits to Gary and Nell in Memphis).

Based upon our review of the record, we conclude that the district court did not view the facts in the light most favorable to the Estates in ruling the discovery rule inapplicable. The linchpin of defendants' argument that the Estates were on inquiry notice of all facts that would have been disclosed by a reasonably diligent investigation is John Tate's visit to the Dolan Street house in 1978. As discussed above, however, disputes exist and the record is unclear concerning when Tate visited the house, how long his visit lasted, the extent to which items of the collection were on display at the time of the visit, and whether ownership of those items was discussed.[7] Considering that Nancy, Helen, and Dennis also resided in—and possibly owned—the house with Gary and Nell, it would be reasonable to infer that whatever Elvis-related items on display belonged to one of them, particularly so in light of Nancy's almost obsessive interest in Elvis and his career.

A genuine dispute of material fact also exists on the subject whether Gary's move to California put his family on inquiry notice of the collection's existence. Defendants contend that the Tates's knowledge of Gary's possession of various Elvis memorabilia at the Cedar Rapids nursing home and his bringing that memorabilia with him to California placed them on inquiry notice. Nancy's testimony that Gary's family knew about the collection supports this argument. According to John Tate's testimony, however, he believed that the items that Gary possessed at the nursing home and brought with him to California constituted the full extent of Elvis memorabilia owned by Gary. Tate and Deeble attested via affidavit—and Tate

---

[7]The record includes various photographs depicting various items of the collection in the Dolan Street house. The photographs are not dated, however, and it is unclear whether such items were on display at the time of Tate's visit.

testified at deposition—that they had no conversations with either Gary or Nell regarding the existence of the collection.

Moreover, a reasonable jury could find that Gary's difficulty in communicating contributed to his relatives' not understanding any comments that he may have made regarding the collection. Additionally, Nell's mental health problems affected her interactions with others. Also relevant is the fact that Gary, and possibly Nell (depending on when in 1982 or 1983 the conversion occurred) died prior to the conversion, and both died prior to the expiration of the statute of limitations.

Defendants argue that Gary's Memphis newspaper obituary demonstrates John Tate's knowledge of the collection's existence at the time of Gary's death. As recounted earlier, however, Tate denied being interviewed by the newspaper or making the quotes attributed to him. Even had he made the quotes attributed to him, the only statement in the obituary regarding the collection neither quoted nor was otherwise attributed to him, and he denied ever reading the obituary prior to this litigation. In addition, the types of memorabilia described in the obituary share similarities with the memorabilia brought by Gary to California. Thus, a genuine issue of material fact exists concerning Tate's pre-2009 knowledge of the collection's existence.

In light of the above-described circumstances, conflicting inferences reasonably can be drawn from the limited facts regarding Tate's visit to the Dolan Street house, the memorabilia brought to California, and Gary's Memphis obituary. These conflicting inferences create genuine issues of material fact concerning whether the Estates should have been on inquiry notice whether the collection had been converted by the defendants. Thus, whether the discovery rule should be applied in this case is a question to be answered by a jury, and summary judgment therefore should not have been entered on the Estates' conversion claim.

IV.

We reverse the judgment with respect to the conversion claim and remand the case to the district court for further proceedings.

_____